**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FLIPCAUSE, INC.,[1] | Case No. |
| Debtor. | |

**DECLARATION OF EMERSON RAVYN IN SUPPORT OF FIRST DAY MOTIONS**

I, Emerson Ravyn, pursuant to section 1746 of title 27 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Executive Chairman of debtor Flipcause Inc., incorporated under the laws of Delaware ("**Flipcause**" or the "**Debtor**"). I have served in this role since 2012.

2. As Executive Chairman of the Debtor, I am familiar with and knowledgeable about the Debtor's day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of this Chapter 11 Case (as defined below). I submit this declaration (this "**Declaration**") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of this Chapter 11 Case and in support of the Debtor's chapter 11 petition and First Day Pleadings (as defined below) filed contemporaneously herewith. I am authorized to submit this Declaration on behalf of the Debtor.

3. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor, my opinion based on experience, knowledge, and information

---

[1] The last four digits of the Debtor's federal tax identification number are 0758. The Debtor's address is 101 Broadway, Oakland, CA 94607.

concerning the Debtor's operations and financial condition, or from my discussions with the Debtor's advisors. If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

4. On the date hereof (the "**Petition Date**"), the Debtor commenced with the United States Bankruptcy Court for the District of Delaware (the "**Court**") a voluntary case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Declaration is provided in support of the Debtor's chapter 11 petition and other motions and applications that the Debtor has filed with the Court, including the First Day Pleadings (as defined herein).

## Preliminary Statement

5. The story of Flipcause is one of community, perseverance and purpose. Its founders, one an innovator in the tech industry and the other, working with nonprofits, recognized a glaring problem: small nonprofits lacked the tools, technology and support needed to thrive. Large organizations had access to advantageous technology and bigger teams, but smaller nonprofits were often left behind due to financial restrictions. Together, the founders combined their unique skills and experiences to create a tool that would empower small nonprofits and transform the way they fundraise. From meager beginnings, Flipcause has grown to become the backbone of online fundraising for thousands of nonprofits across all fifty states.

## I. Corporate History and Structure
### A. Historical Operations.

6. Incorporated in 2012, Flipcause, Inc. ("**Flipcause**" or the "**Debtor**") is a subscription based software-as-a-service platform that provides tools for non-profits such as

fundraising portals, payment processing, and administrative functions to better engage supporters of their causes. For a fee, the Debtor provides an online platform for non-profit organizations to utilize and engage with their supporters, suppliers and donors, as best fits each non-profits' needs. When the non-profits utilize their platform to receive donations or sell tickets to events, Flipcause then earns processing fees in addition to the monthly or annual subscription fees.

7.  The Debtor's suite of operational and administrative tools and services includes, but it is not limited to: (i) website hosting and management tools; (ii) online event ticketing and registration tools; (iii) fundraising campaign tools; (iv) text-to-give tools; and (v) online storefront tools.  The Debtor has operated for more than a decade and has supported thousands of nonprofit clients across the United States. Over the course of its operations, the platform has processed tens of millions of dollars in transactions annually.

8.  Utilizing a third-party payment processor for its centralized payment processing infrastructure system, the Debtor generates revenue through a combination of software subscription fees, transaction-based processing fees, and related administrative services. Flipcause's business model is designed to allow nonprofit clients to access fundraising and payment infrastructure without directly contracting with payment processors or managing the associated compliance and operational requirements.

**B.    Current Operations.**

9.  On December 4, 2025, the Debtor's third-party payment processor, Stripe, notified the Debtor that it was ceasing business with the Debtor and placed a hold on 100% of Debtor's credit reserves (see Section F, below). As a result, the Debtor has not been able to conduct its business, provide services to its non-profit clients, or generate any revenue.

## II.     Events Leading to This Chapter 11 Case

10.     Beginning in 2022, Flipcause evaluated strategic alternatives, including a potential sale of the business, and engaged an investment banker in early 2023 to assist in pursuing a transaction. During 2023 and 2024, the Debtor achieved its highest historical levels of revenue and profitability, reinforcing management's and advisors' expectation that a strategic transaction remained achievable. Although a transaction was pursued through 2025, including efforts that continued through the end of October 2025, no transaction ultimately materialized. Continuing operations during this period were undertaken to preserve enterprise value and platform continuity for the benefit of creditors and stakeholders. Ultimately, Flipcause decided that a court-supervised restructuring process was needed in order to stabilize operations, preserve the value of its assets, and ensure an orderly and transparent resolution for creditors and other stakeholders.

### A.     California Attorney General Cease and Desist Order

11.     In November 2025, the California Attorney General issued an administrative cease and desist order (the "**California Order**") asserting that Flipcause was operating as a "charitable fundraising platform" under California Government Code Section 12599.9 and related provisions. The California Order directs Flipcause to, among other things, "cease and desist from all operations related to solicitations for charitable purposes in California."

12.     Flipcause timely appealed the 2025 cease and desist order and requested a formal evidentiary hearing. The appeal asserts, among other things, that the Attorney General lacks jurisdiction because Flipcause does not solicit charitable contributions, does not receive or hold charitable assets, and does not operate as a charitable fundraising platform as defined by statute. Flipcause further asserts that its long-standing Merchant-of-Record and Agent-of-Payee structure places it outside the regulatory framework applied in the order. That appeal remains pending.

13. While Flipcause is confident that it will prevail in its appeal, the California Order currently ties Flipcause's hands as far as its ability to conduct business in the State of California.

### III. Sale Process

14. Beginning in 2022, following more than a decade of platform maturation and sustained operational growth, Flipcause initiated a structured evaluation of strategic alternatives, including a potential sale or recapitalization. This effort was not driven by financial distress. Rather, it reflected the Company's assessment that it had reached a level of scale, stability, and operational maturity at which a transaction could unlock value for stakeholders while positioning the platform for its next phase of growth.

15. By end of 2022, Flipcause had grown into a $10 million-plus gross revenue organization, supported by a durable nonprofit customer base, a proven operating model, and long-standing infrastructure across payments, compliance, and customer operations. That growth had been achieved over many years through internally funded expansion and founder-supported capital structures, including debt incurred during earlier growth phases to reach scale. While manageable in ordinary operations, that capital structure limited Flipcause's ability to independently fund certain expansion initiatives or platform evolutions without introducing additional leverage or dilution.

16. Management and the Board therefore concluded that Flipcause would be better positioned under a recapitalized ownership structure or strategic partner. Such a structure would allow legacy capital constraints to be resolved, provide resources for continued platform development, and support long-term operational resilience. At the same time, a transaction would allow existing stakeholders to realize value that had been built over more than a decade of disciplined growth.

17. Accordingly, in 2022 the Company began engaging advisors and preparing for a formal M&A process. From the outset, Flipcause was explicit with its advisors regarding timing and objectives. The Company's intent was to pursue a transaction on a defined and proactive timeline, with the goal of completing a sale or recapitalization by the beginning of 2024. This timing was selected to align with prevailing market conditions, the Company's revenue scale, and the belief that a timely transaction would allow for the resolution of negative working capital dynamics while positioning the business for its next phase of expansion.

18. Throughout this period, Flipcause continued to operate as a going concern, maintain platform continuity, and invest in readiness efforts consistent with a near-term transaction. In early 2023, Flipcause engaged an investment banker to assist in pursuing a sale process. The investment banker was retained to provide advice on transaction structure, valuation considerations, market outreach and execution of a potential sale transaction.

19. As part of the M&A process, Flipcause received a credible letter of intent and engaged in related transaction discussions. In parallel, the Debtor engaged in advisor-led financing transactions that were structured with the expectation that a strategic transaction would occur within a reasonable time frame. Based on these developments, management reasonably believed that pursuing a transaction remained the most effective path to maximizing value and resolving liabilities, and continued to rely on the guidance of its professional advisors.

20. As market conditions for SaaS, fintech, and payments-adjacent businesses deteriorated, transaction timelines across the sector lengthened and valuation dynamics shifted. In this environment, Flipcause pursued an auction process with an initial bid deadline in July 2025. Although the auction process did not result in a binding transaction by the July 2025 deadline, the Debtor's investment banker continued to believe that a transaction capable of providing a full

creditor recovery remained achievable. Based on this guidance, the Debtor continued to engage in transaction discussions and pursue potential alternatives.

21. Following the July 2025 auction outcome, Flipcause worked closely with its investment banker and executive team to pursue a potential transaction through the fall of 2025. These efforts included continued engagement with prospective counterparties and evaluation of transaction structures that could address the Company's obligations.

22. Efforts to close a transaction continued through November 2025. During this period, the Debtor continued operating the platform in the ordinary course with the objective of preserving enterprise value and maintaining continuity for clients and stakeholders. By late October 2025, it became clear that the anticipated transaction would not come to fruition within a time frame sufficient to address the Debtor's liquidity and operational needs. In the absence of a transaction, and in light of ongoing market pullback and cash flow compression, the Debtor determined that continued reliance on a non-binding transaction process was no longer appropriate. At that point, management promptly shifted to preparing a court-supervised restructuring process in order to stabilize operations, preserve the value of the Debtor's assets, and ensure an orderly and transparent resolution for creditors and other stakeholders.

23. Contemporaneous with the filing of the petition and this Declaration, the Debtor has filed its *Motion for Entry of (I) an Order (A) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially all of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief; and (II) an Order (A) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and*

*Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "**Sale Motion**"), seeking authority of this Court to enter a sale process which will allow for a rigorous bidding process and result in the sale of the Debtor's assets to the highest and best bidder.

### IV.     First Day Pleadings

24.     Contemporaneously herewith, Flipcause has filed a number of pleadings aimed at facilitating a smooth transition for Flipcause into chapter 11, stabilizing existing business operations, and facilitating the efficient administration of this Chapter 11 Case, including the following (collectively, the "**First Day Pleadings**"):

#### A.     Motion for Use of Cash Collateral ("Cash Collateral Motion")

25.     The Debtor has an immediate and continuing need for use of assets that may constitute secured creditors' cash collateral (the "**Cash Collateral**"), namely Processing Fees and Subscription Fees, to pay the expenses of operating its business including, without limitation, salaries, administrative costs, utilities, maintenance and insurance costs in its capacity as debtor-in-possession. The availability of the use of Cash Collateral will provide the Debtor with more than just the necessary cash it needs to operate their businesses. Of almost equal importance is the sense of confidence that such use of post-petition Cash Collateral will instill in the Debtor's customers and employees. The failure of the Debtor's creditors to cooperate with the Debtors at this time, and the potential attendant loss of customers and sales, could irreparably harm the Debtor's hopes of maximizing the value of their assets and their chances for a successful sale process. Without immediate use of post-petition Cash Collateral, the Debtor will continue to suffer the liquidity issues that existed pre-petition and that threatens the Debtor's ability to maintain their operations in the short term.

26. The Debtor seeks authority, immediately and on an ongoing basis, to use Cash Collateral and cash proceeds from the collection of any accounts receivable, to pay the expenses of operating its business and other administrative expenses during the pendency of the case.

**B.    Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Maintain, Continue, and Renew its Property, Casualty, Liability and Other Insurance Policies and Agreements, and (II) Honor all Obligations in Respect thereof (the "Insurance Motion")**

27. The Debtor maintains various insurance programs providing coverage for, among other things, general liability, workers' compensation liability, employers' liability, cyber liability and data breach expense coverage (collectively, the "**Insurance Programs**"). The Insurance Programs include coverage primarily from the insurance policies (the "**Insurance Policies**"), which Debtor has obtained through third-party insurance carriers (the "**Insurance Carriers**").

28. It is essential to Debtor's business that it receives authority to: (a) maintain its Insurance Policies and Insurance Programs; (b) renew or replace its Insurance Policies and Insurance Programs, if necessary, in the ordinary course of business during the pendency of this case; and (c) pay the Insurance Obligations.

29. The Debtor seeks entry of an order authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change its prepetition Insurance Policies, Surety Bonds and LCs, or enter into new policies, Surety Bonds and LCs, if necessary, in the ordinary course of business and (b) pay all prepetition obligations in respect thereof, including brokerage and administrative fees (collectively, the "**Insurance Obligations**") in the ordinary course of business and pay prepetition obligations in respect thereof.

**C. Motion for an Order (I) Authorizing the Debtor to (A) Continue and Maintain its Consolidated Cash Management System, (B) Continue and Maintain its Existing Bank Accounts, (C) Use Existing Business Forms and (D) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief (the "Cash Management Motion")**

30. In the ordinary course of its business, the Debtor manages its cash, receivables, and payables through a cash management system (the "**Cash Management System**"). The Cash Management System is designed to efficiently collect, transfer, and disburse funds, a schematic of which is attached as Exhibit 1 to the Proposed Orders to the Cash Management Motion. The Cash Management System is comparable to the centralized cash management systems commonly used by businesses similar in size and scale to the Debtor.

31. The Debtor maintains accounting controls in connection with its Cash Management System and is able to accurately trace the funds flowing through the Cash Management System to ensure that all transactions are adequately documented and readily ascertainable. As a result, the Debtor is able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

32. **The Debtor's Bank Accounts.** As of the Petition Date, the Debtor maintains a single business checking account with Citibank (the "**Citibank Account**"), which currently has a positive balance of approximately $70,000. The Citibank Account serves as the main operating account for paying items including payroll, operating fees, bank fees, and payout processing requests by Debtor's non-profit clients.

33. As of the Petition Date, the Debtor maintains a single merchant account with Stripe, Inc., who is the sole third-party payment processor for Debtor's centralized payment processing infrastructure system (the "**Stripe Account**"). From June 2015 until early December 2025, Stripe

processed substantially all of the electronic payments received by the Debtor. As of the Petition Date, the Stripe Account has a positive balance of approximately $1,145,114.97.

34. The Debtor's centralized payment processing infrastructure system is not only critical to the Debtor's ability to provide non-profits with a suite of operational and administrative tools and services which enable the non-profits to solicit and accept electronic payments and donations from subscribers, supporters or donors via said non-profit's website on the Debtor's software-as-a-service-platform and processed through the Debtor's centralized payment processing infrastructure system, but it also enables the Debtor to receive electronic payments from non-profits for monies owed on account of annual subscription fees, processed transaction-based fees and related administrative services provided by the Debtor to the non-profits.

35. The Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtor and its estate, including, *inter alia*, the ability to: (a) control and secure corporate funds, (b) ensure the maximum availability of funds when necessary, (c) reduce costs and administrative expenses associated with the movement of funds, and (d) obtain timely and accurate account balance information.

36. For the foregoing reasons, it is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest that the Court grant the relief requested in the Cash Management Motion.

**D.    Motion for Entry of an Order Authorizing the Debtor to (I) Pay Prepetition Wages and Other Compensation, and (II) Continue Employee Benefit Programs ("Wages Motion")**

37. The Debtor has 6 full-time employees and 5 contractors (collectively, the "**Employees**").

38. <u>Wages</u>.  Before the Petition Date and in the ordinary course of business, the Debtor typically paid Employee Compensation Obligations semi-monthly.  The Debtor processes payroll through a third-party, Rippling.

39. <u>Leave Policies</u>.  The Debtor offers its employees other forms of compensation, including vacation days, holidays, civic duties leave, and bereavement days. These forms of compensation are, in certain cases, required by statute, and in all cases, usual, customary, and necessary for the Debtor to retain qualified employees to operate its business. Failure to provide these benefits could contravene applicable law and harm employee morale and encourage the premature departure of employees. The Debtor therefore requests authority to continue these programs in the ordinary course of business during this Chapter 11 Case.

40. <u>Flexible Paid Time Off Policy</u>.  Prior to the Petition Date, the Debtor offered its employees a Flexible Paid Time Off Policy which allowed employees to take the time needed for illness, personal business, bereavement, civic duty and/or vacation. The Debtor's employees were not limited in the amount of time and/or days they could take pursuant to the Flexible Paid Time Off Policy. Additionally, the Debtor's employees were offered eight paid holidays per year.

41. <u>Health and Welfare Benefits</u>.  Prior to the Petition Date, the Debtor offered its Employees various health and welfare benefits, including medical, dental, vision, health savings, life, long-term disability, pension and 401(k).  The Debtor contributes approximately $5,380.00 monthly towards the cost of these Health and Welfare benefits.

42. <u>Expense Reimbursements</u>.  In the ordinary course of its business, some of the Debtor's employees incur expenses on behalf of the Debtor.  All expenses incurred on behalf of Debtor, by authorized Employees, are charged to the Debtor's corporate credit cards. As of the

Petition Date, the Debtor does not have any expense reimbursement obligations to Employees due and outstanding.

43. For the foregoing reasons, I believe it is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest that the Court grant the relief requested in the Wages Motion.

**E.    Motion for Interim and Final Orders (I) Authorizing, But Not Directing, Payment of Prepetition Sales, Use, Property and Similar Taxes and Fees, and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing ("Tax Motion")**

44. In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including sales, use, and various other taxes, fees, charges, and assessments (the "**Taxes and Fees**"). The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "**Taxing Authorities**") in connection with the operation of its business. The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.

45. Pursuant to the Tax Motion, the Debtor is seeking authority to pay certain prepetition taxes in the ordinary course of its business. In addition, the Debtor is requesting that all Banks on which checks to third parties are drawn and/or electronic payments are made pursuant to this Tax Motion be authorized to receive, process, honor, and pay any and all such checks (whether issued or presented before or after the Petition Date) and electronic payments, and to rely on the representations of the Debtor as to which checks are authorized to be paid.

**F.     Motion For Entry of an Order Authorizing the Debtor to File Certain Portions of Its Creditor Matrix, Schedules and Statements, and Related Documents Containing Employee Information Under Seal**

46.     The Debtor's employees have a right to have certain of their personal information kept private and not filed publicly as it relates to this bankruptcy proceeding.

47.     By this Motion, the Debtor requests entry of an Order authorizing it to file under seal those portions of the Documents to be Sealed that contain its Employees' home addresses. The Debtor will provide unredacted information in the Documents to be Sealed to the Office of the United States Trustee and the Court. The Employees will receive notices in this case similar to other interested parties listed on the matrix; the requested relief simply seeks to keep the Employees' personal home addresses off of the public docket maintained by this Court.

**G.     Motion for Entry of an Order (I) Authorizing and Directing Debtor's Payment Processor Stripe, Inc. (A) to Cease Any Holds on Debtor's Funds, (B) to Fulfill Their Payment Processing Obligations Under the Payment Processing Agreement With Debtor, (C) to Comply With the Automatic Stay, and (II) Granting Related Relief ("Stay Relief Motion")**

48.     Central to the Debtor's ability to provide the Non-Profits with this suite of operational and administrative tools and services is the Debtor's centralized payment processing infrastructure system. The Debtor's centralized payment processing infrastructure system is critical to a Non-Profit's ability to solicit and accept electronic payments and donations from subscribers, supporters or donors at a Non-Profit's online storefront or during a Non-Profit's fundraising campaign. The Debtor's centralized payment processing infrastructure system also enables the Debtor's Non-Profits to avoid the financial and administrative burden associated with the management and compliance of a third-party payment processing relationship.

49. Since July 2015, Debtor has utilized Stripe as the sole third-party payment processor for its centralized payment processing infrastructure system pursuant to the parties' Payment Processing Agreement.

50. On or about December 2, 2025, and on the eve of the Debtor's bankruptcy filing, Stripe informed the Debtor that it was conducting an internal review to determine whether it would continue to provide payment processing services to Debtor and whether it could continue to support the Debtor's business moving forward and requested certain information from the Debtor to assist it with that internal review. On or about December 4, 2025, without notice or explanation, Stripe informed the Debtor that it is no longer able to continue providing payment processing services to the Debtor and notified the Debtor that it was placing a 100% fixed credit reserve on the Debtor's account until February 28, 2026. As of the date of this filing, Stripe is holding approximately $1,088,825.18 of Debtor's funds in the Reserve. Without Stripe fulfillment of its obligations under the Payment Processing Agreement, the Debtor is not able to continue to provide a payment processing infrastructure system for its non-profit clients, which is essential to the Debtor's ability to continue operating its business and generating revenue.

51. The Debtor seeks entry of an order authorizing and directing the Debtor's payment processor Stripe to (i) cease any holds on Debtor's funds, (ii) fulfill their payment processing obligation obligations under the Payment Processing Agreement with Debtor, and (iii) comply with the automatic stay.

52. Several of the First Day Pleadings request authority to pay certain pre-petition claims. I understand from my advisors that in chapter 11 matters that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first twenty-one days of the bankruptcy case "except to the extent relief

is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. In light of Bankruptcy Rule 6003, Flipcause has narrowly tailored its requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its bankruptcy estate. Other relief will be deferred for consideration at a later hearing.

53. I have consulted with my colleagues at Flipcause, as well as with Flipcause's professional advisors, regarding the relief requested in the First Day Pleadings, and understand each of the First Day Pleadings and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Pleadings are true and accurate, and each such factual statement is incorporated into this Declaration by reference.

54. Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Pleadings is (a) necessary to enable the Debtor to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) critical to the Debtor achieving a successful restructuring; and (c) in the best interest of the Debtor's estate and its stakeholders. I believe that, if the Court does not grant the relief requested by the Debtor in the First Day Pleadings, the Debtor's business and its estate will very likely suffer immediate and irreparable harm. Accordingly, for the reasons set forth herein and in the First Day Pleadings, the Court should grant the relief requested in each of the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: December 19th, 2025

_____
Emerson Ravyn
Executive Chairman of the Debtor