**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------x
:
In re:                                          :   Chapter 11
                                                :   Case No. 25-12246 (TMH)
FLIPCAUSE, INC.,                                :
                                                :
                                                :
              Debtor.                           :   Re: D.I. 11
                                                :
---------------------------------------------------------------x

**OBJECTION OF GRAND AVENUE INVESTMENTS LP TO THE
DEBTOR-IN-POSSESSION'S MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS AUTHORIZING THE DEBTOR-IN-POSSESSION TO
USE CASH COLLATERAL AND GRANTING RELATED RELIEF**

Grand Avenue Investments LP ("**Grand Avenue**"), by and through its undersigned attorneys, Togut, Segal & Segal, LLP, and the Rosner Law Group, hereby submits this objection (the "**Objection**") to the *Debtor-In-Possession's Motion For Entry of Interim And Final Orders Authorizing The Debtor-In-Possession To Use Cash Collateral And Granting Related Relief*, filed on December 19, 2025 as Docket No. 11 (the "**Cash Collateral Motion**"), and respectfully states:

**PRELIMINARY STATEMENT**[1]

1.  Flipcause, Inc. ("**Flipcause**" or the "**Debtor**") filed this Chapter 11 Case on the heels of an unsuccessful sale process, a cease and desist order issued by the California Attorney General that halted all operations in California (the "**Cease and Desist Order**"), and loss of access to the payment processing infrastructure necessary for continued operation its business,

---

[1] Capitalized terms used and not defined herein will have the meanings ascribed to them elsewhere within the Objection or in the Cash Collateral Motion.

1

including its ability to generate revenue.[2] The Payment Processor has frozen at least $790,000.00, the bulk of Flipcause's funds, as a "reserve" to protect the Payment Processor from potential losses as a result of its relationship with Flipcause.[3]

2. Grand Avenue is the largest secured creditor in this Chapter 11 Case, with a Secured Claim in excess of $1.2 million.[4] Through the Cash Collateral Motion, Flipcause asks this Court for permission to use Grand Avenue's cash collateral to fund Flipcause's business operations and the Chapter 11 Case. While Grand Avenue recognizes Flipcause's request to use cash collateral, that request should be denied. Flipcause cannot meet its burden of showing that Grand Avenue will receive adequate protection of its Secured Claim. See § 363(p)(1).

3. In the Cash Collateral Motion, Flipcause argues that Grand Avenue is adequately protected by: (i) a $14,000,000 equity cushion, the existence of which is highly speculative at this juncture in the proceedings, and (ii) the "added value" of ensuring that Flipcause continues to operate as a going concern.[5]

---

[2] *Declaration of Emerson Ravyn In Support Of First Day Motions*, filed on December 19, 2025, as Docket No. 4 (the "**First Day Declaration**"), at ¶¶ 10, 11, and 50; Transcript of Hearing, In re Flipcause, Inc., No. 25-12246 (TMH) (Bankr. D. Del. Dec. 22, 2025) (the "**First Day Transcript**") at 27:7–25, 28:1; 35:4–14, 36:6–11.

[3] See *Stripe Inc.'s Objection To Debtor's Motion For Entry Of An Order (I) Authorizing And Directing The Debtor's Payment Processor Stripe Inc. (A) To Cease Any Holds On Debtor's Funds, (B) To Fulfill Its Payment Processing Obligations Under The Payment Processing Agreement With Debtor, (C) To Comply With Automatic Stay, And (II) Granting Related Relief*, filed by Stripe, Inc. (the "**Payment Processor**") on December 29, 2025, as Docket No. 26 (the "**Stripe Objection**"). Upon information and belief, the Payment Processor has debited or intends to debit the Debtor's account to pay (i) fines assessed against the Payment Processor arising from the Payment Processor's relationship with the Debtor, and (ii) services fees for use of the Payment Processor's systems for December 2025 and January 2026. In the event the Bankruptcy Court determines that these funds are property of the estate, they comprise Grand Avenue Collateral. Grand Avenue reserves all rights with respect to the funds held by the Payment Processor, including its right to assert that its security interest in such funds is superior to that of the Payment Processor.

[4] The Cash Collateral Motion acknowledges that Grand Avenue's secured claim is properly perfected but only accounts for the $600,000.00 face value of the Grand Avenue Note. Grand Avenue's secured claim also includes $612,042.58 in accrued but unpaid interest, for a total secured claim of $1,212,042.58 (such amount, plus costs and fees, the "**Secured Claim**").

[5] The proposed order attached to the Cash Collateral Motion provides for replacement liens in post-petition assets acquired using cash collateral, however, as explained in greater detail herein, it is unclear how Flipcause will acquire additional assets without any mechanism for receiving payments.

2

4. The purported $14,000,000 equity cushion is based entirely on the self-serving statements of the Debtor's management.[6] The Debtor has not produced any term sheets to support its assertions, nor procured a stalking horse bidder.[7] If anything, the testimony at the first day hearing demonstrates that the value of this enterprise has precipitously declined, even before its operations ceased.[8] This is insufficient to support Flipcause's request to use Grand Avenue's cash collateral under the facts of this Chapter 11 Case.

5. There is no "added value" from Flipcause's continued operation. On December 4, 2025, the Payment Processor "notified the Debtor that it was ceasing business with the Debtor and placed a hold on 100% of the Debtor's credit reserves. . . . As a result, **the Debtor has not been able to conduct its business, provide services to its non-profit clients, or generate any revenue**."[9] In other words, without the Payment Processor, Flipcause cannot operate, and there is no competent evidence that Flipcause will be able to timely, if ever, resume its operations, or effectuate a sale to a potential purchaser based on its current business model.[10] *Ergo*, even if Flipcause met its burden of demonstrating that Grand Avenue is protected by an equity cushion – a burden which Flipcause has not met – any such cushion would rapidly erode because Flipcause cannot provide services or generate revenue.

6. Because Flipcause has no cash flow, it cannot provide Grand Avenue with any adequate protection payments, cash payments, or superpriority expense claims, while Grand

---

[6] Cash Collateral Motion at ¶ 19.
[7] First Day Transcript at 35:12–14; 36:8–11.
[8] First Day Transcript at 35:4–8, *contra* 35:15–18 (testifying to a $40M offer in 2023 and offers of around $12M immediately prior to the Petition Date).
[9] First Day Declaration at ¶ 9.
[10] Further, Flipcause's inability to operate raises serious questions regarding its budget, which largely depends on subscription fees funneled through the Payment Processor to fund operations.

Avenue bears the full cost of funding this Chapter 11 Case.[11] Grand Avenue holds liens on substantially all of Flipcause's assets, including proceeds thereof, and its ability to recover on its Secured Claim is at substantial risk. Grand Avenue is entitled to adequate protection, but Flipcause has not provided sufficient (or any) adequate protection, nor demonstrated with evidence in an admissible form a sufficient equity cushion. For these reasons and those set forth below, Grand Avenue objects to the relief requested in the Cash Collateral Motion.

7. In the event the Court intends to grant Flipcause use of cash collateral, Grand Ave requests that any order authorizing such use be revised to be include the following forms of adequate protection (collectively, the "**Proposed Adequate Protection Package**"):

- A superpriority administrative claim in their continuing order of priority that existed as of the Petition Date, solely to the extent of any post-Petition Date diminution in value of the Grand Avenue Collateral arising from the Debtor's use of the Cash Collateral (the "**Superpriority Claim**"), which shall have priority over all other administrative expense claims and unsecured claims against the Debtor's estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 364, 365, 503(a), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114;

- Adequate Protection payments equal to no less than $58,968.02 per month, payable on the first day of each month;

- A budget agreed to in form and substance by Grand Avenue, including permitted variance of no more than 5% in the aggregate, 0% of which may be attributable to professional fees and/or restructuring costs;

- Weekly financial reporting, including: (a) budget to actual variance reports with respect to each line item, (b) accounts receivable aging detail reports, (c) accounts payable detail reports, and (d) all records of Flipcause's bank account;

- Access to books and records upon request; and

---

[11] Although the proposed interim order attached to the Cash Collateral Motion permits Flipcause to make regular monthly payments to its secured creditors, the attached budget provides for $0 in payments to long term debt. *See* Cash Collateral Motion at **Exhibit B**.

4

- Payment of Grand Avenue's fees and costs (including reasonable attorneys' fees) during the Chapter 11 Case.

8. In addition to the Proposed Adequate Protection Package, any interim order approving the Cash Collateral Motion must also include, among other things, an agreed-to events of default provision, stipulation as to the amount of Grand Avenue's claims as of the petition date, stipulation as to the validity, extent, and priority of the liens securing Grand Avenue's collateral, credit bidding rights, and other customary provisions (collectively, the "**Customary Provisions**").

## BACKGROUND

### A. General

8. On December 19, 2025 (the "**Petition Date**"), Flipcause filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").

9. As of the date hereof, the Debtor is in possession of its assets and remains in control of its "business" as a debtor in possession under section 1107(a) and 1108 of the Bankruptcy Code. No committee, trustee, or examiner have been appointed in this Chapter 11 Case.

10. On January 5, 2025, the California Attorney General filed the *Motion Of The California Attorney General, A Real Party In Interest, For Appointment Of A Chapter 11 Trustee Or In The Alternative, Conversion Of The Case To Chapter 7* as Docket No. 40 (the "**Chapter 11 Trustee Motion**").

### B. The Note And Grand Avenue Collateral

11. Grand Avenue is a private investment firm holding a Secured Claim against the Debtor in excess of $1.2 million.

12. Grand Avenue and Flipcause are parties to that certain *Convertible Promissory Note* issued in the principal sum of $600,000.00 and dated August 7, 2023 (together with accrued

and unpaid interest thereon, the "**Note**").[12] Among other things, the Note provides that the Note (i) is a senior secured obligation of Flipcause, and (ii) is secured by substantially all assets of Flipcause, including (a) any and all amounts owed to Flipcause from any merchant processor processing charges made by customers of the Company via credit card or debit card transactions; and (b) all other tangible and intangible personal property, including, but not limited to cash and cash equivalents (the foregoing and as further defined in the Note, the "**Grand Avenue Collateral**").

13. Grand Avenue perfected its security interest in the Grand Avenue Collateral by filing UCC-1 financing statements on December 7, 2023 with (i) the State of California, Office of the Secretary of State, and (ii) the Delaware Department of State, U.C.C. Filing Section. Flipcause has acknowledged that Grand Avenue's liens are valid and perfected.[13]

14. As of the date hereof, Grand Avenue holds a Secured Claim of no less than $1,212,042.58, plus costs and fees under the Note, under which interest continues to accrue.

C. **The Proposed Use of Cash Collateral**

15. Grand Avenue has not consented to Flipcause's use of any cash collateral. Through the Cash Collateral Motion, Flipcause seeks Court-authorized use of the Grand Avenue's cash collateral to pay, among other things, payroll obligations and working capital needs. The proposed budget attached to the Cash Collateral Motion relies entirely on subscription payments from customers through the next six weeks, which payments comprise Grand Avenue Collateral.[14] The proposed budget also includes line items for professional fees

---

[12] The Note is subject to that certain *Agreement of Guaranty* dated August 7, 2023 by and between Grand Avenue and Emerson Ravyn.
[13] Cash Collateral Motion at ¶ 15.
[14] *See* Cash Collateral Motion at **Exhibit B**.

and restructuring costs.[15] The proposed budget does not allocate any amounts to payment of long term debt.[16]

## OBJECTION TO CASH COLLATERAL MOTION

16. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral if "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Notably, under section 363(e) of the Bankruptcy Code, a secured creditor's interest in collateral is entitled to adequate protection. 11 U.S.C. § 363(e). Section 363(e) recognizes that property interests of secured creditors are entitled to protection under the Fifth Amendment and "insure[s] that the secured creditor receives the value for which he bargained." S. Rep. No. 95-989, at 50 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5839; *accord* H.R. Rep. No. 95-595, at 303 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6295; *see United Sav. Assoc. of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1397 (5th Cir. 1986), *aff'd*, 484 U.S. 365 (1988) ("Although the stay temporarily prevents that aspect of the bargain from being fulfilled, a creditor should not be prejudiced by a debtors' continued use of collateral during the proceeding. That bargain must be protected by compensating for a decline in the value of the collateral through its use during the pendency of the stay."); *see also In re O.P. Held, Inc.*, 74 B.R. 777, 782-84 (Bankr. N.D.N.Y. 1987) (holding that secured lender must be assured of the maintenance and recoverability of its lien, and that debtor must prove that secured creditor will realize the value of its bargain).

---

[15] *Id.*
[16] *Id.*

17. Section 361 of the Bankruptcy Code identifies three non-exclusive means of providing adequate protection, the third being explicitly flexible as to method: (a) "requiring the trustee to make a cash payment or periodic cash payments to such entity" to the extent the trustee's use of cash collateral or other estate property "results in a decrease in the value of such entity's interest in such property"; (b) "providing to such entity an additional or replacement lien to the extent that" the trustee's use of estate property "results in a decrease in the value of such entity's interest in such property"; and (c) "granting such other relief . . . "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. The debtor bears the burden of proving that its secured lender is adequately protected. *See* 11 U.S.C. § 363(p)(1); *see also In re S. Side House, LLC*, 474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012) ("It is well settled that the debtor bears the burden to demonstrate that a creditor is adequately protected.") (citing *In re Constable Plaza Assocs. L.P.*, 125 B.R. 98, 104 (Bankr. S.D.N.Y. 1991)).

18. Here, Flipcause proposes two sources of adequate protection to Grand Avenue: (i) Flipcause's generalized and unsupported statement that its assets are worth more than Grand Avenue's Secured Claim, creating an equity cushion, and (ii) the added value of ensuring that Flipcause continues to operate as a going concern.

19. Flipcause's proposed adequate protection is illusory because Flipcause's present value is entirely speculative and, more importantly, it is unable to operate its business, service its clients, or generate revenue. As such, Flipcause cannot offer any meaningful protections to Grand Avenue in exchange for use of the Grand Avenue Collateral. Because Flipcause fails to carry its burden, the Cash Collateral Motion should be denied.

### A. The Equity Cushion Is Entirely Speculative, and Likely to Erode

20. Courts have recognized that "where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection." *In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) (citing *In re Liona Corp.*, 68 B.R. 761, 767 (Bankr. E.D. Pa. 1987)). This is particularly important where "a debtor's future operational plans may result in a rapid deterioration of the collateral." *In re Sharon Steel Corp.*, 159 B.R. at 169; see also, *In re Liona Corp., N.V.*, 68 B.R. 761, 767 (Bankr. E.D. Pa. 1987) (considering the rate at which the cushion will be eroded; whether periodic payments are to be made to prevent or mitigate the erosion of the cushion; and, if the property is to be liquidated, the likelihood of a reasonably prompt sale).

21. Here, Flipcause asserts that its assets provide a substantial equity cushion of approximately $14 million based on a $16 million enterprise valuation, which purportedly adequately protects Grand Avenue's interests under section 361.[17] However, this valuation is entirely speculative. Flipcause has provided no evidence that the company can continue its operations, prevent a rapid deterioration in the value of the Grand Avenue Collateral, or conduct a reasonably prompt sale of its assets.

22. The cases on which Flipcause relies in support of the Cash Collateral Motion are inapposite, at best: *In re Indian Palms Associates*, 61 F.3d 197 (3d Cir. 1995) (Comparing the calculation for an equity cushion under bankruptcy code sections 361(d)(1) and (2), and reversing district court determination that the debtor had equity in 176-unit apartment complex); *In re Aventine Renewable Energy Holdings, Inc.*, Case No. 09-11214 (KG), Hr'g Tr. At 244: 15-24 (Bankr. D. Del. April 14, 2009)(Expert witness with extensive experience in the field of

---

[17] Cash Collateral Motion at ¶ 19.

valuation and business reorganization valued numerous operating facilities, including the real property and equipment, liquid AR and inventory, including highly-collectable receivables from some of the top refiners in the country, all under the assumption that the business would continue to operate in the same capacity); *In re May*, 169 B.R. 462 (Bankr. S.D. Ga. 1994)(making no determination as to whether the debtor has any equity cushion in certain real property and requiring the debtor to segregate rents generated by the property for use solely for the costs and expenses of maintaining the property); *In re Realty Southwest Associates*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992)(similarly requiring segregation of cash collateral where property valuation was undisputed); *In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D.N.H. 1993)(approving cash collateral use for a limited period where decline in cash collateral resulted from an interruption in operations viewed by the court as an "aberration" that did not take away from the debtors' demonstrated ability to generate new business, collect on an extraordinarily high percentage of receivables, and to manage their affairs more efficiently and effectively); *In re Fortune Smooth (U.S.) Ltd.*, 1993 WL 261478 (Bankr. S.D.N.Y. July 6, 1993)(the Bankruptcy Court applied its extensive experience in valuing a single asset real estate property, finding that the equity cushion did not constitute adequate protection given that it was certain to decline in the immediate future, and further considering the uncertain nature of the real estate market in making this determination); *In re Elmira Litho, Inc.*, 174 B.R. 892 (Bankr. S.D.N.Y. 1994)(lender failed to establish that debtors lacked equity in property for purposes of relief from the automatic stay); *In re C.B.G. Ltd.*, 150 B.R. 570 (Bankr. M.D. Pa. 1992)(denying debtor's request for post-petition financing and finding 14% equity cushion in partially-developed land did not provide lender with adequate protection, relying, in part, on the lender's appraisal where debtor's "expert" was not a licensed appraiser); *In re Utah 7000, L.L.C.*, 2008 WL 2654919 (Bankr. D. Utah July 3,

2008)(finding that the lenders were adequately protected where debtors' property included $526M in real property, personal property valued at $1.6M, additional income streams totaling $32M, and where lenders would receive "significant additional" previously unencumbered collateral to protect their interests); *In re 1606 New Hampshire Ave. Associates*, 85 B.R. 298 (Bankr. E.D. Pa. 1988)(finding that a lender failed to meet its burden under 362(d) where debtor's expert, a certified appraiser of real property for twenty-two years, valued a building at $2.15M and opined that value was likely to increase); *In re Pawtuxet Valley Prescription & Surgical Center, Inc.*, 2008 WL 1990887 (Bankr. D.R.I. Mar. 10, 2008)(permitting continued use of cash collateral for a limited time where the lender previously stipulated as to the value of its real property collateral and debtor expected to collect $1M of receivables).

23.    These cases generally involved operating assets and real property valued by experts. For example, in *Aventine*, the debtors relied on hours of testimony by experts with decades of experience in the ethanol production space, testifying to the value of production facilities based on, among other things, extensive research and recent comparable sales on very similar facts. *See*, *Aventine* Hr'g Tr., *passim*. In *Utah 700*, the lenders' collateral included hundreds of acres of real property with substantial infrastructure in place, multiple income streams from operations, and the provision of *additional* adequate protection in the form of liens on previously unencumbered property. *See*, *Utah 7000, L.L.C.*, 2008 WL 2654919 at *5-6.

24.    The facts of this case are wholly different from those Flipcause has cited. Flipcause's assets are neither as liquid as the accounts receivable and commodities at issue in *Aventine*, nor as reliably stable as the real estate in *Utah 700*. Flipcause's asset is a software service, the primary aspect of which is no longer operational. Flipcause's purported equity cushion, which it derives from a non-operational enterprise, is based on the entirely speculative

and self-serving representations of management.[18] This is particularly troubling where, as here, the Debtor's management faces credible allegations of mismanagement and unreliability.[19]

25. The marketplace has already addressed Flipcause's asserted market value. Indeed, Flipcause has been exploring a sale of its business for at least three years and has failed to procure a willing buyer.[20] Further, it is doubtful whether this company can either be sold promptly or as a going concern. Flipcause has not articulated any go-forward plan to, among other things, (i) replace the Payment Processor so that the company can receive payments for its subscription services, or (ii) continue its operations without violating the Cease and Desist Order. As such, this enterprise, whatever it is worth, will continue to erode in value as its subscription customers migrate to other platforms. Flipcause has not agreed to make any cash payments or periodic payments to Grand Avenue to mitigate such erosion.

B. **Flipcause Is Not Operating As A Going Concern**

26. The Cash Collateral Motion asserts that Grand Avenue's cash collateral use will preserve going-concern value, but Flipcause has not operated as a going concern since at least December 4, 2025, when the Payment Processor terminated its services. Without the Payment Processor, Flipcause cannot operate the core of its SaaS platform resulting in zero transaction revenue. Indeed, Flipcause has not established that it can accept any form of payment at this time without the help of the Payment Processor. As of the filing of this Objection, Flipcause has been unable to find a replacement processor, so even if the Payment Processor returns all of the funds, they will be depleted without replacement.

---

[18] Notably, the petition indicates $3,830,975.55 in payments to insiders during the year leading up to the Petition Date. *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, ECF No. 1 at 90, *In re Flipcause, Inc.*, Case No. 25-12246 (TMH) (Bankr. Del. Dec. 19, 2025)

[19] See, Chapter 11 Trustee Motion at ¶ 9; First Day Transcript 80:7-13 (. . ."one would certainly consider whether an outside fiduciary might have been brought in to assist with the management of the business because there are really, really significant problems").

[20] First Day Declaration at ¶ 10.

27. Under current circumstances, Flipcause's use of Grand Avenue's cash collateral without adequate protection would significantly prejudice Grand Avenue's secured position and deprive it of the value for which it bargained. Replacement liens on post-petition assets acquired with Grand Avenue's cash collateral, essentially the only form of protection the Flipcause currently offers, are meaningless because Flipcause cannot operate and lacks the banking infrastructure to take in any revenue to which such liens would attach. Accordingly, the Cash Collateral Motion should be denied.

28. In the event the Court finds that Grand Avenue is adequately protected by an equity cushion, any order approving use of the Grand Avenue Collateral should include the Proposed Adequate Protection Package and the Customary Provisions to protect Grand Avenue's interest during Flipcause's proposed sale process.

## **RESERVATION OF RIGHTS**

29. This Objection is submitted without prejudice to, and with full reservation of, Grand Avenue's rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this Objection to seek discovery, to raise additional objections, and to introduce evidence at any hearing related to this Objection, and without in any way limiting any other rights of Grand Avenue to object to the Cash Collateral Motion on any grounds, as may be appropriate.

**NOTICE**

30. Notice of this Objection has been or will be provided to the following parties or their counsel of record: (i) the Debtor; (ii) the Office of the United States Trustee; and (iii) any party that, as of the filing of this Objection, has requested notice pursuant to Bankruptcy Rule 2002.

DATED: Wilmington, Delaware
          January 12, 2026

                            GRAND AVENUE INVESTMENTS LP.
                            BY ITS ATTORNEYS,
                            TOGUT, SEGAL & SEGAL, LLP

                            By:    /s/*Anthony L. Greene*
                                      Frank A. Oswald, Esq.
                                      Anthony L. Greene, Esq.
                                      One Pennsylvania Plaza, Suite 3335
                                      New York, New York 10019
                                      (212) 594-5000
                                      Email: agreene@teamtogut.com
                                                    frankoswald@teamtogut.com


                                      *and*

                            THE ROSNER LAW GROUP LLC

                            By:    *Frederick B. Rosner*
                                        Frederick B. Rosner, Esq. (DE#3995)
                                      824 N. Market Street
                                      Suite 810
                                      Wilmington, DE 19801
                                      (302) 777-1111
                                      Email: rosner@teamrosner.com