# EXHIBIT 1

Asset Purchase Agreement

71013/0001-52673378

*EXECUTION COPY*

**ASSET PURCHASE AGREEMENT**

by and between

**FLIPCAUSE, INC.**,

Seller,

and

**S4NP CORPORATION**,

Purchaser

Dated as of February 27, 2026

71193/0001-52581497v2

*EXECUTION COPY*

**TABLE OF CONTENTS**

**Page**

**ARTICLE 1** DEFINITIONS AND CONSTRUCTION.................................................................. 1
Section 1.1        Definitions................................................................... 1
Section 1.2        Construction............................................................. 13

**ARTICLE 2** THE TRANSACTION .................................................................... 13
Section 2.1        Sale and Purchase of Purchased Assets ................................. 13
Section 2.2        Excluded Assets ......................................................... 16
Section 2.3        Assumed Liabilities ..................................................... 17
Section 2.4        Excluded Liabilities .................................................... 17
Section 2.5        Consideration ........................................................... 19
Section 2.6        Purchaser Deposit ...................................................... 19
Section 2.7        Allocation of Purchase Price............................................ 20
Section 2.8        Post-Closing Adjustments to Purchase Price............................. 20
Section 2.9        Closing .................................................................. 21
Section 2.10       Closing Deliveries....................................................... 21
Section 2.11       Payment of Assumed Cure Amounts................................... 22
Section 2.12       Consents ................................................................ 23
Section 2.13       Withholding ............................................................. 23

**ARTICLE 3** REPRESENTATIONS AND WARRANTIES OF THE SELLER....................... 24
Section 3.1        Organization.............................................................. 24
Section 3.2        Authority and Enforceability ........................................... 24
Section 3.3        Title to Assets; Liens ................................................... 25
Section 3.4        Claims, Litigation and Disputes........................................ 25
Section 3.5        Contracts ................................................................ 25
Section 3.6        Intellectual Property..................................................... 25
Section 3.7        Governmental Authorizations........................................... 26
Section 3.8        Real Property.  . ......................................................... 26
Section 3.9        Employment Matters..................................................... 26
Section 3.10       Employee Benefits........................................................ 27
Section 3.11       Taxes..................................................................... 27
Section 3.12       Data Privacy and Security................................................ 27
Section 3.13       Disclaimer ............................................................... 28

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............... 28
Section 4.1        Organization and Good Standing....................................... 28
Section 4.2        Authority and Enforceability ........................................... 28
Section 4.3        Legal Proceedings....................................................... 28
Section 4.4        Independent Investigation .............................................. 28

**ARTICLE 5** COVENANTS ..................................................................... 29
Section 5.1        Access and Investigation................................................ 29
Section 5.2        Operation of the Business............................................... 29

1

Section 5.3        Employee Matters. ................................................................ 30
Section 5.4        Consents, Filings and Introductions to Critical Vendor Contacts;
Commercially Reasonable Efforts. .............................................................................. 31
Section 5.5        Supplements to Disclosure Schedules ...................................... 32
Section 5.6        Confidentiality ........................................................................ 32
Section 5.7        Public Announcements .............................................................. 33
Section 5.8        Further Actions ........................................................................ 33
Section 5.9        Bankruptcy Court Matters......................................................... 33
Section 5.10       Bankruptcy Court Approval....................................................... 34
Section 5.11       Assumption & Rejection of Executory Contracts....................... 34
Section 5.12       Intentionally Omitted. .............................................................. 36
Section 5.13       Payments Received .................................................................. 36
Section 5.14       Cessation of Use of Acquired Intellectual Property ................... 36
Section 5.15       Transfer of Permits and Governmental Authorizations................ 36
Section 5.16       Excluded Contracts .................................................................. 37
Section 5.17       Assignability of Certain Contracts............................................. 37

**ARTICLE 6** CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE........................... 37
Section 6.1        Conditions to the Obligation of the Purchaser............................. 37
Section 6.2        Conditions to the Obligations of the Seller................................. 38

**ARTICLE 7** TERMINATION.......................................................................................... 39
Section 7.1        Termination Events. .................................................................. 39
Section 7.2        Effect of Termination................................................................ 40

**ARTICLE 8** NO SURVIVAL ......................................................................................... 40
Section 8.1        No Survival of Representations and Warranties and Certain Covenants ....... 40

**ARTICLE 9** TAX MATTERS ........................................................................................ 40
Section 9.1        Transfer Taxes. ........................................................................ 40
Section 9.2        Proration Items......................................................................... 41
Section 10.1       Notices .................................................................................... 41
Section 10.2       Amendment............................................................................... 42
Section 10.3       Waiver and Remedies ............................................................... 42
Section 10.4       Entire Agreement...................................................................... 43
Section 10.5       Assignment, Successors and No Third Party Rights ................... 43
Section 10.6       Severability .............................................................................. 43
Section 10.7       Exhibits and Schedules ............................................................. 43
Section 10.8       Interpretation............................................................................ 43
Section 10.9       Expenses .................................................................................. 44
Section 10.10      Limitation on Liability............................................................... 44
Section 10.11      Specific Performance ................................................................ 44
Section 10.12      Governing Law; Jurisdiction; Waiver of Jury Trial...................... 44
Section 10.13      No Joint Venture ...................................................................... 45
Section 10.14      Counterparts; Signatures........................................................... 45

71193/0001-52581497v2

**Exhibits**

Exhibit A – Form of Bill of Sale

Exhibit B – Form of Assignment and Assumption Agreement

Exhibit C – Form of Intellectual Property Assignment

**Schedules**

Schedule 2.1(b) – Acquired Intellectual Property

Schedule 2.1(d) – Governmental Authorizations

Schedule 2.10(a)(x) – Usernames, Passwords and Access Credentials

Schedule 5.11(a) – Assumed Contract Schedule

**Seller Disclosure Schedules**

Schedule 3.3 – Title to Assets, Liens

Schedule 3.4 – Claims, Litigation and Disputes

Schedule 3.5 – Contract & Cure Schedule

Schedule 3.6(a) – Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements

Schedule 3.6(b) – Exceptions to Clear Title

Schedule 3.6(d) - Intellectual Property Claims Brought Against the Seller

Schedule 3.7 – Listing of Governmental Authorizations

Schedule 3.8 – Real Property

Schedule 3.9 – Employees and Independent Contractors

Schedule 3.10 – Employee Plans

Schedule 3.12 – Privacy Policies

3

71193/0001-52581497v2

*EXECUTION COPY*

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of February 27, 2026, by and between **JEFFREY T. TESTA**, as chapter 11 trustee (the "Trustee") for **FLIPCAUSE, INC.**, a Delaware corporation ("Seller"), and **S4NP CORPORATION**, a Delaware corporation, or one or more of its designees (the "Purchaser").

## RECITALS

WHEREAS, the Seller is a subscription based software-as-a-service platform that provides tools for non-profits such as fundraising portals, payment processing, and administrative functions to better engage supporters of their causes (the "Business");

WHEREAS, on December 19, 2025 (the "Petition Date"), Seller filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, subject to and upon the terms and conditions herein, the Seller desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, all of the Purchased Assets (as defined below);

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to a Sale Order (as defined below) approving such sale free and clear of all Liens and Claims, other than Assumed Liabilities (as defined below), all as more specifically set forth in this Agreement and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bid Procedures Order (as defined below); and

WHEREAS, the Seller and the Purchaser have negotiated in good faith and at arm's length for the purchase and sale of the Purchased Assets and the assumption of certain Liabilities associated therewith, all subject to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements, representations and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

Section 1.1     Definitions.  For the purposes of this Agreement:

1

71193/0001-52581497v2

"Acquired Intellectual Property" has the meaning set forth in Section 2.1(b).

"Administrative Expense Claim" means an allowed claim for an expense incurred that is actual and necessary to preserving the Seller's estate under 11 U.S.C. § 503.

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person, and all Subsidiaries of such Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  Notwithstanding the foregoing, under no circumstance will the Purchaser and the Seller be deemed Affiliates of one another notwithstanding the possession by the Purchaser (whether or not exercised) of any rights of control with respect to the Seller.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 2.7(a).

"Allocation Statement" has the meaning set forth in Section 2.7(a).

"Alternative Transaction" means any transaction or series of related transactions (other than pursuant to this Agreement), whether effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by the Seller, pursuant to which the Seller: (i) accepts a Qualified Bid, other than that of the Purchaser or its Affiliates, as the highest or otherwise best offer; or (ii) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in Seller or other interests in the Purchased Assets, including a stand-alone plan of reorganization, plan of liquidation, or refinancing, all or substantially all of the Purchased Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than the Purchaser or its Affiliates.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.9(a)(iv).

"Assigned Real Property Leases" means the real property leases set forth on Schedule 3.10.

"Assumed Contracts" has the meaning set forth in Section 2.1(c).

"Assumed Contract Schedule" has the meaning set forth in Section 5.11(a).

"Assumed Cure Amounts" has the meaning set forth in Section 2.3(b).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Effective Date" has the meaning set forth in Section 5.11(a).

2

"Assumption Procedures" means the procedures for the assumption and assignment of Executory Contracts as contemplated in this Agreement, the Bid Procedures and the Bid Procedures Order.

"Auction" means the bankruptcy auction for the sale and assumption of the Seller's assets and certain liabilities, conducted by the Seller pursuant to the Bid Procedures Order.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bid Procedures" means the procedures governing, among other things, the solicitation of bids and the conduct of the Auction for the Purchased Assets under the supervision of the Bankruptcy Court, which are attached to the Bid Procedures Order.

"Bid Procedures Order" means that certain *Order (A) Approving Bid Procedures and Bid Protections in Connection With the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief*, entered by the Bankruptcy Court.

"Bill of Sale" has the meaning set forth in Section 2.10(a)(ii).

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in New York or Delaware are closed either under applicable Law or action of any Governmental Authority.

"Business Payments" has the meaning set forth in Section 5.13.

"Chapter 5 Actions and Claims" means, with respect to any Person, all avoidance actions, claims or causes of action that constitute property of such Person's bankruptcy estate under section 541 of the Bankruptcy Code, including claims and causes of action under chapter 5 of the Bankruptcy Code or any other applicable law, including all avoidance, fraudulent transfer, preference, or similar claims, causes of action, rights, or proceedings of any Seller (including, under chapter 5 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act) enacted by any state, or any other similar state or Federal law, and all proceeds therefrom.

"Chapter 11 Case" means the case commenced by the Seller by filing the Petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court being administered under Case No. 25- 12246 (TMH), styled *In re Flipcause Inc.*

"Chapter 11 Documents" has the meaning set forth in Section 5.9.

3

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"Closing Date Statement" means, a statement setting forth, as of the Closing Date, (i) the WebPack Shadow Clients, (ii) the WebPack Visible Clients, and (iii) the Non-WebPack Clients; *provided*, *however*, under no circumstances shall the number of WebPack Clients be less than the WebPack Client Closing Threshold.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the regulations promulgated thereunder.

"Company Owned Intellectual Property" means all Intellectual Property owned by Seller.

"Company Used Intellectual Property" means all right, title and interest of Seller in all Intellectual Property owned or controlled by a Third Party that is (i) licensed or sublicensed to Seller or for which Seller has obtained a covenant not to be sued or (ii) otherwise used or held for use in connection with the Business.

"Confidential Information" means any and all information, data, materials, and other subject matter of any kind, whether tangible or intangible, in any form or medium (whether oral, written, electronic, or otherwise), that is not generally known to the public and that is or has been used, developed, created, conceived, owned, possessed, controlled, or obtained by Seller or its Affiliates, or to which Seller or its Affiliates has or had access, in each case to the extent it relates to the Business, the Purchased Assets, the Assumed Liabilities, or the operation, conduct, or history of the Business, including without limitation: (i) products or services; (ii) fees, costs and pricing structures; (iii) designs and specifications; (iv) analyses; (v) drawings, photographs and reports; (vi) computer software, including electronic mail, operating systems, applications and program listings; (vii) flow charts, transaction summaries and models, manuals and documentation; (viii) databases; (ix) financial reports, investment summaries, and accounting and business methods; (x) ideas, formulas, compositions, inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice; (xi) supplier, customers and clients and supplier, customer, contact or client lists and other marketing data or plans; (xii) know-how; (xiii) manufacturing and production processes and techniques; (xiv) research and development information; (xv) files and records; (xvi) employee lists, employee information, personnel records, compensation information, salary information, benefits information, and contractor information; (xvii) contracts, agreements, terms and conditions, legal strategies, litigation strategies, regulatory filings, compliance records, permits, licenses, regulatory correspondence, and legal opinions; and (xviii) all other confidential, proprietary, or non-public information, materials, documentation, records, and data of any kind relating to the Business, and all tangible embodiments of any of the foregoing (whether in documentary, electronic, or other form), except that Confidential Information will not include any information that has been published in a form generally available to the public, other than as a result of a disclosure by the parties hereto or their respective representatives.

71193/0001-52581497v2

"Contract" means any contract, agreement, arrangement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation.

"Contract & Cure Schedule" has the meaning set forth in Section 3.5.

"Copyrights" means all copyrights (whether or not registered), copyrightable works and all other corresponding rights, including copyrights in software and in the content contained on any website, and registrations and applications for any of the foregoing in any jurisdiction, and all derivative works, moral rights, renewals, extensions, reversions or restorations associated with any of the foregoing, and all goodwill associated with any of the foregoing.

"Cure Amount" means, for any Executory Contract, the amount required to be paid under section 365 of the Bankruptcy Code to effectuate the assumption and assignment of such Executory Contract by the Seller party thereto to the Purchaser, as determined by the agreement of the parties to such Executory Contract or by Order of the Bankruptcy Court; provided, however, Cure Amount shall specifically exclude any post-petition amounts due and payable by the Seller to the counterparty to the Executory Contract, which shall be an Administrative Expense Claim payable by the Seller's estate.

"Employee Plan" means any (i) "employee benefit plan" as defined in Section 3(3) of ERISA, (ii) compensation, employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, agreement, arrangement, program or policy or (iii) other plan, agreement, arrangement, program or policy providing for compensation, bonuses, profit-sharing, equity or equity-based compensation or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangement), medical, dental, vision, prescription or fringe benefits, life insurance, relocation or expatriate benefits, perquisites, disability or sick leave benefits, employee assistance program, workers' compensation, supplemental unemployment benefits or post-employment or retirement benefits (including compensation, pension, health, medical or insurance benefits), in each case whether or not written (x) that is sponsored, maintained, administered, contributed to or entered into by Seller for the current or future benefit of any current or former Service Provider or (y) for which Seller has any direct or indirect liability.

"Employees" has the meaning set forth in Section 5.3(a).

"Environmental Law" means any Law concerning: (i) the treatment, disposal, emission, discharge, Release or threatened Release of, or exposure to, Hazardous Material; (ii) human health and safety, or (iii) the protection of the environment (including natural resources, air and surface or subsurface land or waters or wildlife), as in effect on the date hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any rules or regulations promulgated thereunder.

"ERISA Affiliate" with respect to an entity means any other entity that, together with such first entity, would be treated as a single employer under Section 414 of the Code.

"Excluded Assets" has the meaning set forth in Section 2.2.

71193/0001-52581497v2

"Excluded Contracts" has the meaning set forth in Section 2.2(a).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Executory Contract" means a Contract that is an "executory contract" or "unexpired lease", as such terms are used in section 365 of the Bankruptcy Code.

"Final Allocation Statement" has the meaning set forth in Section 2.7(a).

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of (i) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing, and (ii) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed.

"Flipcause Website Package" means the suite of services offered by Seller to its subscription billed customers, including, but not limited to, website management and hosting, donations and payments, events and registration, text-to-give, peer-to-peer fundraising, crowdfunding, online store, sponsorships, integrated tools and ongoing support.

"GAAP" means the United States' generally accepted accounting principles in effect from time to time.

"Go-Forward Vendor" means a vendor or service provider with whom Purchaser anticipates doing business following the Closing as set forth on Schedule 2.1(k), which Schedule must be provide no later than ten (10) days before the Closing.

"Governmental Authority" means any: (i) nation, region, state, county, city, town, village, district or other jurisdiction; (ii) federal, state, local, municipal, foreign or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal); (iv) multinational organization exercising judicial, legislative or regulatory power; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government.

6

71193/0001-52581497v2

"Governmental Authorization" means any approval, consent, ratification, waiver, license, Permit, registration or other authorization issued or granted by any Governmental Authority.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under, any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Income Taxes" means (a) all Taxes based upon, measured by, or calculated with respect to gross or net income, gross or net receipts or profits (including franchise Taxes and any capital gains, alternative minimum, and net worth Taxes, but excluding ad valorem, property, excise, severance, production, sales, use, real or personal property transfer or other similar Taxes), (b) Taxes based upon, measured by, or calculated with respect to multiple bases (including corporate franchise, doing business or occupation Taxes) if one or more of the bases upon which such Tax may be based, measured by, or calculated with respect to is included in clause (a) above or (c) withholding Taxes measured with reference to or as a substitute for any Tax included in clauses (a) or (b) above.

"Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (i) all Patents; (ii) all Copyrights; (iii) all mask works, mask work registrations and mask work applications and all other corresponding rights; (iv) all Trademarks; (v) all ideas, concepts, creations, inventions, discoveries, improvements, and inventions (whether patentable or unpatentable and whether or not reduced to practice), specifications, designs, industrial designs, models, devices, prototypes, network configurations and architecture, user interfaces, schematics and development tools, domain names, web addresses, uniform resource locators and other names and locators associated with the internet, know how, technology, technical data, algorithms, procedures, processes, methods, techniques, trade secrets, Confidential Information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, customer lists, customer data, customer contact and registration information, customer correspondence and customer purchasing histories, distributor, reseller and supplier lists and information, technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, personnel, customer service, online analytics and other information, research, materials, correspondence, records, and other documentation, and other proprietary information of every kind; (vi) all Software, websites, content, images, logos, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, drawings, reports, analyses, writings, and other works of authorship and copyrightable subject matter, firmware, development tools, algorithms, models, methodologies, formulae, files, records, technical drawings and related documentation, data and manuals; (vii) all data, databases, data collections, other compilations and collections of data or information; (viii) all licenses and permits to the extent transferable; (ix) all rights of privacy and publicity, (x) social media, YouTube, and other online content accounts, tags, registrations or user names (including "handles") (xi) all other intellectual property rights; (xii) all rights to assert, claim or sue and collect damages for the past, present or future infringement, misappropriation or other violation of any of the foregoing; (xiii) all goodwill associated with any

7

of the foregoing; and (xiv) all tangible embodiments of the foregoing (whether documentary, electronic or otherwise).

"Intellectual Property Assignment" has the meaning set forth in Section 2.9(a)(vii).

"IRS" means the Internal Revenue Service.

"Judgment" means any Order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Knowledge of the Seller" or "the Seller's Knowledge" means the actual knowledge of the Seller's current Chief Executive Officer after due inquiry into the facts or circumstances supporting any representation, warranty or statement qualified by such terms.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code enforced or entered by, a Governmental Authority.

"Leased Real Property" means all real property set forth on Schedule 3.10 that is leased.

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Lien" means any possessory or non-possessory lien, license (other than with respect to any Company Used Intellectual Property), encumbrance or charge against or other interest in any property or assets, whether voluntary or involuntary and whether statutory or contractual, including any mortgage, deed of trust, deed to secure debt, pledge, assignment, hypothecation, security interest, attachment, judgment, levy, conditional sale agreement, right of first refusal, right of first offer or other arrangement, and including any agreement to give any of the foregoing.

"Non-Income Taxes" means any Taxes other than Income Taxes, including ad valorem, use, property, excise, sales, severance, production, gross proceeds, conservation, use or other similar Taxes based upon the acquisition, operation or ownership of the Purchased Assets, but excluding, for the avoidance of doubt, Transfer Taxes.

"Non-Proration Items" has the meaning set forth in Section 9.2.

"Non-WebPack Clients" means all clients of Seller that are not WebPack Clients.

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Outside Date" has the meaning set forth in Section 5.9(b)(i).

"Patent" means all national and multinational statutory invention registrations, invention disclosures, patents and patent applications of any type issued or applied for in any jurisdiction, including all industrial designs, utility models, plant and design patents, provisionals, non-

8

provisionals, continuations, divisionals, continuations-in-part, continued prosecution applications, renewals, reissues, extensions, supplementary protection certificates, reexaminations and the equivalents of any of the foregoing in any jurisdiction, and all inventions disclosed in each such registration, patent or patent application, and all goodwill associated with any of the foregoing.

"PCI" means payment card industry.

"Permit" means all permits, licenses, consents, approvals, franchises, accreditations, certifications, easements, rights of way and authorizations related to the operation of the Business.

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Petition Date" means December 19, 2025, the date on which the Petition was filed with the Bankruptcy Court.

"Petition" has the meaning set forth in the Recitals.

"Post-Closing Access and Cooperation Period" has the meaning set forth in Section 10.14(a).

"Privacy Laws" means all applicable data protection and privacy laws, regulations, and rules, including, without limitation the General Data Protection Regulation (EU) 2016/679 and the UK General Data Protection Regulation, the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act of 2020, state data breach notification laws, all other applicable federal, state, local, and foreign laws relating to data protection, data privacy, data security, breach notification, and the collection, use, storage, disclosure, transfer, and processing of personally identifiable information.

"Prepaid Expenses" means deposits, refunds, rebates, credits and all other prepaid charges and expenses of the Seller, including without limitation, all security deposits made under 11 U.S.C. § 366, if any, and security deposits associated with any Executory Contract or lease that is an Assumed Contract.

"Previously Omitted Contract" has the meaning set forth in Section 5.11(e).

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Proration Items" has the meaning set forth in Section 9.2.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

71193/0001-52581497v2

"Purchased Inventory" has the meaning set forth in Section 2.1(a).

"Purchaser" has the meaning set forth in the Preamble.

"Qualified Bid" means competing bids that are submitted in accordance with the Bid Procedures and Bid Procedures Order.

"Receivables" has the meaning set forth in Section 2.1(l).

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Renewal Period" means the period after the initial term of the Services Agreement, during which the WebPack Shadow Client or the WebPack Visible Client, as applicable, may renew and extend or elect to cancel the Services Agreement.

"Retained Client Revenue Adjustment" means the sum of the Retained Non-WebPack Client Revenue Adjustment and the Retained WebPack Client Revenue Adjustment.

"Retained Non-WebPack Client" means any Non-WebPack Client listed on the Closing Date Statement who generated any subscription-based revenue for Purchaser during the Stabilization Period.

"Retained Non-WebPack Client Revenue" means, with respect to any Measurement Period during the Stabilization Period, the total aggregate subscription-based revenue collected by the Purchaser from the Retained Non-WebPack Clients during such Measurement Period.

"Retained Non-WebPack Client Revenue Adjustment" means 70% of the Retained Non-WebPack Client Revenue.

"RetainedWebPack Client" means any WebPack Client listed on the Closing Date Statement who generated any subscription-based revenue for Purchaser during the Stabilization Period.

"Retained WebPack Client Revenue" means, with respect to any Measurement Period during the Stabilization Period, the total aggregate subscription-based revenue collected by the Purchaser from the Retained WebPack Clients during such Measurement Period.

"Retained WebPack Client Revenue Adjustment" means 50% of the Retained WebPack Client Revenue.

"Sale Order" means, collectively, an Order of the Bankruptcy Court in form and substance reasonably acceptable to the Purchaser and Seller: (i) approving the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts to the Purchaser free and clear of all Claims and Liens pursuant to section 363(f) of the Bankruptcy Code, on the terms and conditions set forth in this Agreement and in such Order; (ii) authorizing consummation of the transactions contemplated hereby; (iii) containing a finding that the transactions contemplated by

10

this Agreement are undertaken by the Seller and the Purchaser (solely in its capacity as such) at arm's length, without collusion and in good faith by the Purchaser within the meaning of section 363(m) of the Bankruptcy Code; (iv) assuring that the Purchaser will not be subject to successor liability for any claims or causes of action of any kind or character against Seller, whether known or unknown, unless expressly assumed as an Assumed Liability pursuant to this Agreement; (v) authorizing the Purchaser to freely own and operate the Purchased Assets; (vi) providing that the Bankruptcy Court shall retain jurisdiction to hear any disputes arising in connection with the transactions contemplated by this Agreement; (vii) permitting the Purchaser to waive, in its sole and absolute discretion, the 14-day stay period under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure; and (viii) granting related relief.

"Schedule" means a schedule included in the Seller Disclosure Schedule and the other schedules attached hereto.

"Seller Disclosure Schedule" has the meaning set forth in Article 3.

"Seller Names and Marks" means any and all (i) Trademarks of Seller, including all names, marks and logos set forth on Schedule 3.6(a) and all design marks and logos therefor and (ii) Trademarks derived from, confusingly similar to or including any of the foregoing.

"Seller" has the meaning set forth in the Preamble.

"Service Provider" means any director, officer, employee or individual independent contractor of Seller.

"Services Agreement" means the agreement for the provision of services by and among the Seller and the WebPack Shadow Client or the WebPack Visible Client, as applicable.

"Software" means computer software (including source and object code), computer programs and applications and other software products and platforms owned, developed, licensed, or distributed by Seller in connection with the Business.

"Stabilization Date" means the date that is 180 calendar days after the Closing Date.

"Stabilization Period" means the period of time between the Closing Date and the Stabilization Date.

"Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

"Stripe" means Stripe, Inc.

"Successful Bidder" means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction, if any, in accordance with the Bid Procedures and Bid Procedures Order.

"Supplement" has the meaning set forth in Section 5.13.

"Tax" means: (i) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including Taxes under section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority; (ii) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute; and (iii) any Liability for the Taxes of another Person.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" means any Person and/or group of Persons other than the Seller or the Purchaser.

"Trademarks" means all trademarks, trade names, service marks, designs, logos, brand names, certification marks, corporate names, trade dress, emblems, signs or insignia, slogans, Internet addresses and domain names, other similar designations of source or origin and general intangibles of like nature, any derivations of any of the foregoing, and all registrations and applications for registrations pertaining to any of the foregoing (including any intent to use applications, supplemental registrations and any renewals or extensions of any of the foregoing), and all goodwill associated with any of the foregoing.

"Transfer Taxes" has the meaning set forth in Section 9.1.

"Transferred Employees" has the meaning set forth in Section 5.3(a).

"Trustee" means Jeffrey T. Testa, as Chapter 11 trustee for Seller.

"WebPack Clients" means collectively, the WebPack Shadow Clients and the WebPack Visible Clients.

"WebPack Client Closing Threshold" means 1,250 WebPack Clients.

"WebPack Shadow Clients" means all current clients of Seller that (i) utilize the Flipcause Website Package, including website management and hosting, donations and payments, events and registration, text-to-give, peer-to-peer fundraising, crowdfunding, online store, sponsorships, integrated tools and ongoing support, and (ii) as of the Closing Date, have elected not to cancel the Services Agreement and the Renewal Period is to occur between September and November 2026.

"WebPack Visible Annual Clients" means all current clients of Seller that (i) utilize the Flipcause Website Package, including website management and hosting, donations and payments,

12

events and registration, text-to-give, peer-to-peer fundraising, crowdfunding, online store, sponsorships, integrated tools and ongoing support, (ii) pay an annual subscription for the Flipcause Website Package, and (iii) as of the Closing Date, have elected not to cancel the Services Agreement and the Renewal Period has lapsed.

"WebPack Visible Quarterly Clients" means all current clients of Seller that (i) utilize the Flipcause Website Package, including website management and hosting, donations and payments, events and registration, text-to-give, peer-to-peer fundraising, crowdfunding, online store, sponsorships, integrated tools and ongoing support, (ii) pay a quarterly subscription for the Flipcause Website Package, and (iii) as of the Closing Date, have elected not to cancel the Services Agreement and the Renewal Period has lapsed.

"WebPack Visible Monthly Clients" means all current clients of Seller that (i) utilize the Flipcause Website Package, including website management and hosting, donations and payments, events and registration, text-to-give, peer-to-peer fundraising, crowdfunding, online store, sponsorships, integrated tools and ongoing support, (ii) pay a monthly subscription for the Flipcause Website Package, and (iii) as of the Closing Date, have elected not to cancel the Services Agreement and the Renewal Period has lapsed.

"WebPack Visible Clients" means collectively, the WebPack Visible Annual Clients, the WebPack Visible Quarterly Clients and the WebPack Visible Monthly Clients.

Section 1.2    Construction. Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise.  The table of contents and the headings of Articles and Sections are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  All words used in this Agreement are to be construed to be of such gender or number as the circumstances require.  The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.  Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement.  Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time.  Any reference to a Contract or other document as of a given date means the Contract or other document as amended, supplemented and modified from time to time through such date, except with respect to any Contract or other document described in the Seller Disclosure Schedule.

## ARTICLE 2
## THE TRANSACTION

Section 2.1    Sale and Purchase of Purchased Assets.  In accordance with the provisions of this Agreement and the Sale Order, and except as set forth in Section 2.2, at the Closing, the Seller will sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Seller's right, title and interest in and to all of the properties and assets of Seller, regardless of whether they are identified on a schedule attached hereto, held or used in or arising from the conduct of the Business, of every kind and description,

13

71193/0001-52581497v2

wherever located, real, personal or mixed, tangible or intangible, known or unknown (other than the Excluded Assets), free and clear of all Liens and Claims other than the Assumed Liabilities, including, but not limited to, the following (all of the assets to be sold, conveyed, assigned, transferred or delivered to the Purchaser are referred to as the "Purchased Assets") *provided, however*, that Purchaser may, in its sole discretion, by written notice to Seller at any time prior to fourteen (14) days after Closing, remove any asset or category of assets from the Purchased Assets or any contract from the Assumed Contracts (as defined below); *provided*, *further*, *however*, that Purchaser's election shall not reduce the Purchase Price:

(a)      Equipment.   All tangible personal property owned by Seller including machinery, furniture, fixtures, equipment, and other personal property owned, leased, licensed, used or held for use in the Business, including all trade fixtures, supplies, computers and other information technology equipment, applications, systems and motor vehicles, including any substitutions or replacements thereof made in accordance with this Agreement between the date of this Agreement and the Closing Date, regardless of where located;

(b)      Intellectual Property.   All Company Owned Intellectual Property, including without limitation, all (i) Seller Names and Marks, and (ii) Patents, Copyrights and Trademarks and all other Intellectual Property, and all Company Used Intellectual Property and IP Agreements set forth on Schedule 2.1(b) (collectively, the "Acquired Intellectual Property");

(c)      Contracts.   All Executory Contracts assumed by Seller and assigned to the Purchaser pursuant to Section 5.11 (collectively, the "Assumed Contracts"); provided, however, that if any Assumed Contract is recharacterized by a Final Order to not be an Executory Contract, then the Seller's rights under and to such Assumed Contract shall be a Purchased Asset;

(d)      Authorizations.   All Governmental Authorizations, including those Governmental Authorizations set forth on Schedule 2.1(d);

(e)      Correspondence.   All correspondence with or to any Governmental Authority (including letters, minutes and official contact reports relating to any communications with any Governmental Authority), including (i) all regulatory submissions with respect to any product, and (ii) all original dossiers with respect to any Governmental Authorizations for any product;

(f)      Advertising Materials.   All advertising, marketing, sale and promotional files and materials (including any television, radio and print content and materials), point of sale materials and website content (together with all source code, design notes and design documents associated therewith solely to the extent it is Company Owned Intellectual Property), including all Company Owned Intellectual Property therein;

(g)      Books and Records.   (a) all books, records, files and papers, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, information and records, personnel and employment records, and financial and accounting records, that are within the Seller's control or readily accessible to the applicable Seller; (b) customer database, excluding any records, data, customer information or any other item that is part of such database which Seller are prohibited by Law from providing to Purchaser or the transfer

14

71193/0001-52581497v2

of which would require consent if the required consent has not been provided; and (c) all websites (whether live or not), Internet or URL addresses, videos, physical models, data, reports, computer codes and sourcing data, advertiser and supplier lists, customer lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, personnel records for Employees and other records that relate in any way to the Business (but excluding any personnel records with respect to former employees of Seller and excluding personnel records with respect to Employees which Seller are prohibited by Law from providing to Purchaser or the transfer of which would require Employee consent);

(h)      Proceeds. All proceeds relating to any and all bonds, letters of credit, guarantees or other security provided by Seller and any and all insurance (other than directors and officers insurance, and only to the extent that such proceeds relate to claims or potential claims arising from facts or circumstances existing or arising on or prior to the Closing Date which claims or potential claims have not been paid or resolved by Seller on or prior to the Closing Date), condemnation and similar proceeds;

(i)      Prepaid Expenses.  All Prepaid Expenses, credits, advance payments, claims, security, deposits, charges, sums and fees (including any such item relating to the payment of Taxes (excluding prepaid insurance and any other item described in Section 2.1(e)) of the Seller to the extent solely related to the Purchased Assets or Assumed Liabilities;

(j)      Security Deposits. All security deposits, maintenance deposits, and any other deposits held by landlords, vendors, trade creditors or any other party, in each case related to the Purchased Assets (including the Assigned Real Property Leases);

(k)      Acquired Causes of Action. All Claims, right or causes of action held by the Seller or its bankruptcy estate (and any proceedings thereof) and any other Claims, rights, actions or causes of action whatsoever whether under bankruptcy or non-bankruptcy law (including, without limitation, any rights to credits, refunds, rebates, allowances, adjustments, setoffs, or recoupments and all claims and causes arising under Chapter 5 of the Bankruptcy Code or similar non-bankruptcy Law) solely to the extent that such Claims, rights, or causes of action are against any person or entity that is: (i) a counterparty to an Assumed Contract; or (ii) a Go-Forward Vendor as set forth on Schedule 2.1(k) (collectively, all acquired claims, rights or causes of action set-forth in this sub-paragraph, the "Acquired Causes of Action");

(l)      Claims. All Claims, including rights, credits, rights in reserves, causes of action, defenses and rights of set-off of Seller or its bankruptcy estate to the extent solely related to the Purchased Assets or Assumed Liabilities, but, specifically excluding the Excluded Claims and Causes of Actions set forth in section 2.2(g) herein; and

(m)      Goodwill.  All the goodwill of the Business including, without limitation, the right to own and use all trade names and all telephone and fax numbers used by the Business (subject to the Purchaser qualifying with the provider of such services to take an assignment of such telephone and fax numbers) and all other intangible assets and rights necessary for the Purchaser to operate the Business as carried on by the Seller prior to the Closing Date.

15

Section 2.2    Excluded Assets.  Notwithstanding the terms of Section 2.1, Seller will retain and will not sell, convey, assign, transfer or deliver to the Purchaser, and the Purchaser will not purchase or acquire, and the Purchased Assets will not include, any of the following assets described below (the "Excluded Assets"):

(a)    Contracts.  Each Contract that is not assumed by Seller and assigned to the Purchaser pursuant to Section 5.11 (each, an "Excluded Contract");

(b)    Receivables.  All accounts receivable and other receivables (together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto), and all causes of action pertaining to the collection of the foregoing ("Receivables");

(c)    Books and Records.  All minute books and records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain or primarily relating to an Excluded Asset or Excluded Liability; provided, however, that the Seller shall provide the Purchaser with reasonable access to and copies of any such materials, at the Purchaser's expense, that relate to the Purchased Assets or Assumed Liabilities;

(d)    Insurance.  All insurance policies and all insurance claims and proceeds except those under Section 2.1(h);

(e)    Prepaid Expenses.  All Prepaid Expenses, deposits and retainers of the Seller to the extent solely related to the Excluded Assets;

(f)    Claims.  All Claims, including rights, credits, rights in reserves, causes of action, defenses and rights of set-off of Seller to the extent solely related to the Excluded Assets;

(g)    Excluded Claims and Causes of Action.  All Claims, causes of action, and commercial tort claims (that are not among the Acquired Causes of Action), and any proceeds from insurance policies insuring against such Claims and causes of action, held by Seller or its bankruptcy estate (including any related rights of setoff or recoupment) against, inter alia, (i) Stripe, Inc. (the "Excluded Stripe Claims"); (ii) the Seller's current or former management, employees, or insiders of the Seller (as defined in section 101(31) of the Bankruptcy Code); (iii) Grande Avenue Investments LP; and (iv) any claims against Seller or any Affiliate thereof or any Service Provider.  For the avoidance of doubt the Excluded Stripe Claims shall include all Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or similar non-bankruptcy Law and any other Claims, rights, actions or causes of action whatsoever whether under bankruptcy or non-bankruptcy law regardless of whether Stipe, Inc. is a Go-Forward Vendor or contract counterparty;

(h)    Accounts and Deposits.  All cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items;

(i)    Utility and Energy Services.  All Claims for payments and credits for payments in respect of utilities and energy services;

16

(j)     Tax Refunds.  All rights to refunds, rebates, credits or similar benefits relating to Taxes and other governmental charges of whatever nature attributable to any period (or portions of a Straddle Period) of time (or portion thereof) ending on or prior to the Closing Date;

(k)     Capital Stock.  All shares of capital stock or other equity interests in Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in Seller;

(l)     Specified Excluded Assets.  All other Assets that are specifically identified as Excluded Assets on Schedule 2.2(l); and

(m)     This Agreement.  All of the Seller's rights under this Agreement and all agreements ancillary to this Agreement (including payments comprising part of the Purchase Price).

Section 2.3     Assumed Liabilities.  In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due only the following Liabilities of the Seller, in each case other than the Excluded Liabilities, and no other Liabilities (the "Assumed Liabilities"), and except for the Assumed Liabilities, the Purchaser shall not be deemed to have assumed any other Liabilities of Seller or any of its predecessors:

(a)     Contractual Liabilities.  All Liabilities arising after the Closing under the Assumed Contracts, the Leased Real Property, and the Governmental Authorizations included in the Purchased Assets that were incurred from the conduct of the Business by the Purchaser following the Closing (other than Liabilities attributable to any failure by Seller to comply with the terms thereof or to the extent attributable to any conduct of Seller with respect to any event or condition first occurring prior to the Closing, in each case to the extent not otherwise an Assumed Liability set forth below);

(b)     Cure Amounts.  All Cure Amounts required to cure defaults under the Assumed Contracts that have not been paid prior to Closing (the "Assumed Cure Amounts"), but not any Executory Contracts rejected or not assumed by Purchaser;

(c)     Employee Benefits and Labor.  Any Liabilities relating to or in connection with any Transferred Employees arising in connection with their relationship with the Purchaser after the Closing; and

(d)     Taxes.  Any Liability for (i) all Taxes attributable to the Business or the Purchased Assets for any period of time beginning on or after the Closing Date and (ii) all Taxes borne by the Purchaser pursuant to Section 9.1 or Section 9.2 to the extent that such Taxes have not been paid prior to Closing, or will not be paid by Seller pursuant to such Sections.

Section 2.4     Excluded Liabilities.  Notwithstanding any other provision of this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming any other Liability of Seller or any of its predecessors of whatever nature, whether presently in existence or arising hereafter, which shall be retained by and remain

71193/0001-52581497v2

Liabilities of Seller (the "Excluded Liabilities").  Such Excluded Liabilities include, but are not limited to, the following:

(a)      Operating Liabilities.  All (i) Liabilities which are not Assumed Liabilities, including but not limited to any claims under Sections 503 and 507 of the Bankruptcy Code, and (ii) Liabilities which are not Assumed Liabilities to the extent relating to claims (including claims instituted after the Closing), events or conditions arising out of or relating in any way to the conduct or operation of the Business or the ownership of the Purchased Assets prior to the Closing, including as a result of the manufacture, design, use, operation, storage, acquisition, development or construction of, or warranties provided with respect to, a Purchased Asset during the period prior to the Closing.

(b)      Taxes.  Any Liability for (i) Taxes of Seller, (ii) Taxes attributable to the Business or the Purchased Assets for any period of time (or portion thereof) ending prior to the Closing Date (as determined pursuant to Section 9.2), (iii) all Taxes borne by Seller pursuant to Section 9.1 and Section 9.2 to the extent that such Taxes have not been paid prior to Closing, or will not be paid by Purchaser pursuant to such Sections.

(c)      Incidents and Events.  All Liabilities and obligations arising out of, relating to or in connection with incidents or events occurring prior to the Closing by any Person employed by, or acting as an independent contractor on the property of or on behalf of, the Seller for payment, claims or benefits under workers' compensation Laws or any other Law;

(d)      Costs.  All Liabilities of the Seller for fees, costs and expenses incurred in connection with the Chapter 11 Case or negotiating, preparing, closing and carrying out this Agreement and the transactions contemplated hereby, including (i) the fees and expenses of attorneys, investment bankers, finders, brokers, accountants and consultants and (ii) any fees, costs and expenses or payments related to any transaction bonus, discretionary bonus, change-of-control payment, retention or other compensatory payments made to any Employee (including the employer portion of any pre-Closing payroll, social security, unemployment or similar Taxes), unless otherwise agreed to by Purchaser;

(e)      Litigation Claims.  Any litigation claims and any other Liabilities arising from any Proceeding (i) arising prior to the Closing, including any tort claims, breach of contract claims, employment claims and discrimination claims, or (ii) to the extent relating to events or conditions arising out of or relating in any way to the conduct of the Business or the ownership of the Purchased Assets prior to the Closing even if instituted after the Closing;

(f)      Penalties, Fines and Settlements.  All penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by Seller of any Law prior to the Closing.

(g)      Environmental.  Any Liabilities arising in connection with or in any way relating to (x) Seller (or any predecessor or any prior owner of all or part of its business and assets), (y) any property now or previously owned, leased or operated by Seller, or (z) the Purchased Assets or any activities or operations occurring or conducted at any real property used or held for use by

18

Seller (including offsite disposal), in each case which arise (i) under or relate to any Environmental Law and (ii) from actions occurring or conditions existing on or prior to the Closing Date;

(h)     Excluded Assets.  Any Liability arising out of or related to any Excluded Asset;

(i)     Indebtedness.  Any Liability in respect of any indebtedness for borrowed money of Seller or any of its predecessors;

(j)     Employee Benefits and Labor.  Except as otherwise provided for under this Agreement, any Liabilities of Seller relating to or arising out of an Employee Plan and any Liabilities relating to (i) any Transferred Employees arising on or prior to the Closing Date, or (ii) any current or former Service Providers who are not Transferred Employees;

(k)     Related Persons.  Any Liabilities to any (i) owner or former owner of capital stock or other equity interests of Seller, or (ii) current or former officer or director of Seller; and

(l)     Non-Transferred Employees.  Any Liabilities relating to or in connection with any Employees that are not Transferred Employees arising in connection with their relationship with Seller, including without limitation, any Liabilities associated with any employee termination claims, including any claims for severance or other similar employment termination benefits.

(m)     Other.  Any Liabilities that are not Assumed Liabilities, including all Liabilities of all other Third Parties.

Section 2.5     Consideration.  The purchase price for the Purchased Assets (the "Purchase Price") shall be $400,000.00 cash via wire transfer of immediately available funds.  The Purchase Price shall also include, and be increased by (i) the aggregate value of the Purchaser's assumption of the Assumed Liabilities, and (ii) the Purchaser's payment of the Assumed Cure Amounts up to an amount not to exceed $50,000.00.

Section 2.6     Purchaser Deposit.  Purchaser previously has deposited into a trust account established by counsel to the Trustee an amount in cash equal to $150,000.00 (the "Purchaser Deposit Amount"), which Purchaser Deposit Amount shall be released by Trustee's counsel and delivered to either Purchaser or Seller in accordance with the provisions of this Agreement as follows:

(a)     If the Closing shall occur, then the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be applied towards the cash portion of the Purchase Price payable by Purchaser under Section 2.5 hereof;

(b)     If this Agreement is terminated by Seller pursuant to Section 7.1(a)(iii), then the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be retained by Seller as liquidated damages; and

19

(c)    If this Agreement is terminated for any reason, other than by Seller pursuant to Section 7.1(a)(iii), then the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be returned to Purchaser.

Section 2.7    Allocation of Purchase Price.

(a)    No less than forty-five (45) days after the Closing Date, the Purchaser will deliver to the Seller, or any trustee appointed under the terms set forth in any bankruptcy plan confirmed by the Seller (as applicable), with a copy to the Official Committee of Unsecured Creditors (the "Committee") appointed in the Chapter 11 Case, an allocation statement (the "Allocation Statement"), setting forth its proposed calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities, which amount shall be subject to adjustment for payments made pursuant to Article 9, among the Purchased Assets, in accordance with Section 1060 of the Code and any comparable provisions of state or local Law (the "Allocation"). The Seller, in consultation with the Committee, will review the Allocation Statement and the Allocation, and, to the extent the Seller disagrees with the content of the Allocation Statement, the Seller will inform the Purchaser of such disagreement within five (5) business days after receipt of the Allocation Statement. The Seller and the Purchaser will attempt in good faith to resolve any such disagreement. If the Seller and the Purchaser are unable to reach a good faith agreement on the content of the Allocation Statement within (30) days of Seller's receipt of the Allocation Statement, any disputed aspects of such Allocation shall be resolved by a nationally recognized independent accounting firm mutually acceptable to Purchaser and Seller. The Allocation, as agreed upon by Purchaser and Seller (as a result of either Seller's failure to object to the Allocation Statement or of good faith negotiations between Purchaser and Seller) or determined by an accounting firm under this Section 2.7(a) (the "Final Allocation Statement"), shall be final and binding upon the parties. Each of Purchaser and Seller shall bear all fees and costs incurred by it in connection with the determination of the Allocation, except that the parties shall each pay one-half (50%) of the fees and expenses of such accounting firm. For purposes of this Section 2.7, all actions of Seller may be the obligations or rights of a liquidating trustee of Seller's estate.

(b)    The Purchaser and the Seller will report the Allocation of the Purchase Price in a manner consistent with the Final Allocation Statement and will act in accordance with the Final Allocation Statement in the preparation and filing of all Tax Returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise.

(c)    The Purchaser and the Seller will promptly inform one another of any challenge by any Governmental Authority to the Allocation made pursuant to this Section 2.7 and agree to consult with and keep each other informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.8    Post-Closing Adjustments to Purchase Price. The Purchase Price shall be increased by the Retained Client Revenue Adjustment. The Retained Client Revenue Adjustment shall be calculated and paid by Purchaser to Seller in installments for each successive thirty (30) calendar day period during the Stabilization Period (each, a "Measurement Period"), with each such installment reflecting the Retained Client Revenue Adjustment attributable to the applicable Measurement Period. Each installment payment shall be due and payable on the tenth (10th) Business Day following the expiration of the applicable Measurement Period.

71193/0001-52581497v2

Section 2.9    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Cole Schotz P.C., 500 Delaware Avenue, Wilmington, DE 19801, at 11:00 a.m., prevailing Eastern time, if not conducted electronically at the option of the parties hereto, as soon as practicable, but in no event later than two (2) Business Days after the date on which all the conditions set forth in Article 6  have been satisfied or (if permissible) waived by the party hereto entitled to waive such condition (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions).  The date and time on and at which the Closing actually occurs is referred to in this Agreement as the "Closing Date".

Section 2.10    Closing Deliveries.

(a)    At the Closing, the Seller will deliver or cause to be delivered to the Purchaser:

(i)    the Purchased Assets;

(ii)    a bill of sale in substantially the form of Exhibit A (the "Bill of Sale") executed by the Seller;

(iii)    an assignment and assumption agreement in substantially the form of Exhibit B (the "Assignment and Assumption Agreement"), executed by the Seller, pursuant to which the Seller shall assign, and the Purchaser shall assume, the Assumed Liabilities;

(iv)    a certificate, dated as of the Closing Date, executed by the Seller confirming the satisfaction of the conditions specified in Sections 6.1(a) and 6.1(b);

(v)    an Intellectual Property assignment agreement in the form of Exhibit C (the "Intellectual Property Assignment") executed by the Seller;

(vi)    the Closing Date Statement;

(vii)    a duly executed certification by Seller in accordance with Treasury Regulations Section 1.1445-2(b)(2) to the effect that Seller is nor a "foreign person";

(viii)    a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying (1) that attached thereto are true and complete copies of all resolutions adopted by the Trustee of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated by this Agreement, (2) the names and signatures of the officers of Seller authorized to sign this Agreement and the other documents to be delivered hereunder and thereunder , and (3) that attached thereto is a certificate from the Secretary of State of the State of Delaware dated within three Business Days prior to the Closing Date, certifying that the Seller is in good standing;

(ix)    to the extent that any Liens or Claims against the Purchased Assets are not released pursuant to the Sale Order, executed termination statements, in form and substance

21

71193/0001-52581497v2

reasonably satisfactory to Purchaser, on Form UCC-3 or such other appropriate form that, when filed or recorded, as the case may be, sufficient to release any and all such documents, provided that Purchaser may record the Sale Order with the appropriate Governmental Authority wherein any uniform commercial code financing statements are recorded against the Seller;

(x)    administrator/owner-level access (including all usernames, passwords and any other access credentials) to all web, app, API and other technical services used by or in connection with the operation of the Business, including, without limitation for the vendors and service providers listed on Schedule 2.10(a)(x);

(xi)    access to all code, data, content and database files used by or in connection with the operation of the Business;

(xii)    all completed legal and compliance reviews of the Business's payment flow business model;

(xiii)    a copy of the Sale Order; and

(xiv)    such other instruments of sale, transfer, conveyance and assignment as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

(b)    At the Closing, the Purchaser will deliver or cause to be delivered to the Seller or for the Seller's benefit:

(i)    the $400,000.00 cash component of the Purchase Price to the Seller in accordance with Section 2.5;

(ii)    an Assignment and Assumption Agreement executed by the Purchaser;

(iii)    evidence of the ability to satisfy the Assumed Liabilities (other than those to be satisfied in cash on the Closing Date) to the extent not provided prior to Closing and to the extent necessary to satisfy the Bankruptcy Code, or as required by order of the Bankruptcy Court;

(iv)    the Bill of Sale executed by the Purchaser;

(v)    a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b);

(vi)    the Intellectual Property Assignment executed by the Purchaser; and

(vii)    such other instruments as the Seller reasonably request for the purpose of consummating the transactions contemplated by this Agreement.

Section 2.11    Payment of Assumed Cure Amounts. The Purchaser shall pay the Assumed Cure Amounts in cash on the Assumption Effective Date in the amount specified on the final

22

Contract & Cure Schedule (or as otherwise fixed by the Bankruptcy Court) for the Assumed Contracts set forth on the final Assumed Contract Schedule, or in such other manner as agreed by the Purchaser and the counterparty to an Assumed Contract to the extent that such Assumed Cure Amounts have not been paid prior to Closing.

Section 2.12   Consents.  Notwithstanding any other provision of this Agreement, this Agreement does not affect an assignment of any Assumed Contract to the extent that such Assumed Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable.  As to any Purchased Asset (including any Assumed Contract and Governmental Authorization), the Seller will use commercially reasonable efforts to obtain as promptly as practicable prior to the Closing the consent of the other parties to transfer such Purchased Asset to the Purchaser or, if required, for novation thereof to the Purchaser or, alternatively, written confirmation from such parties reasonably satisfactory to the Purchaser that such consent is not required.  If any consent, waiver, confirmation, novation or approval is not obtained with respect to any such Purchased Asset prior to the Closing, then, prior to the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing all of the Chapter 11 Case and, subject to the Seller having appropriate levels of resources and personnel, the Seller, at the sole cost and expense of the Purchaser, (a) will use commercially reasonable efforts to continue seeking the same after the Closing, or (b) upon the written request of the Purchaser, and to the extent permitted by applicable Law, the Seller and the Purchaser will establish an agency type or other similar arrangement reasonably satisfactory to the Seller and the Purchaser under which the Purchaser would obtain (including by means of subcontracting, sublicensing or subleasing arrangement), to the extent practicable, all rights, and assume the corresponding Assumed Liabilities thereunder for the period of time that the Purchaser shall receive such rights, or under which the Seller would enforce, for the benefit of the Purchaser, with the Purchaser assuming and agreeing to pay the Seller's Liabilities and expenses (other than Excluded Liabilities) for the period of time that the Purchaser shall receive such benefits, any and all rights of Seller against a Third Party to any such Purchased Asset, and, in such event: (i) the Seller will promptly pay to the Purchaser when received all moneys relating to the period on or after the Closing Date received by it under any Purchased Asset not transferred pursuant to this Section 2.12; and (ii) the Purchaser will promptly pay, perform or discharge when due any Assumed Liabilities arising thereunder after the Closing Date but not transferred to the Purchaser pursuant to this Section 2.12.  The failure by the Seller to obtain any required consent, waiver, confirmation, novation or approval with respect to any Assumed Contract and those set forth in Section 6.1(k), will not relieve any party from its obligation to consummate at the Closing the transactions contemplated by this Agreement.  Except as expressly set forth in this Agreement, the Purchaser acknowledges that no adjustment to the Purchase Price will be made for any such Assumed Contracts that are not assigned and that the Purchaser will have no claim against the Seller after the Closing in respect of any such unassigned Contracts or Governmental Authorizations.

Section 2.13   Withholding.  The Purchaser and its Affiliates shall be entitled to deduct and withhold from any amount otherwise payable to the Seller pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under any provision of federal, state, local or foreign Law.  If any amount is so withheld and timely paid to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of the Agreement as having been paid to the Seller.

23

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

Seller represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows, except as (subject to Section 5.5) set forth on the Seller Disclosure Schedules delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule"):

Section 3.1    Organization.  Seller is duly organized and validly existing and in good standing under the Laws of its jurisdiction of formation.  Except as a result of the filing of the Petition, Seller has all requisite power and authority to conduct the Business as presently conducted.  Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not reasonably be expected to have a material adverse effect.

Section 3.2    Authority and Enforceability; Conflicts; Consents.

(a)    Subject only to the entry of the Bid Procedures Order and the Sale Order, Seller has all requisite corporate power, authority and capacity to execute and deliver this Agreement and the other agreements contemplated hereunder and to perform its obligations under this Agreement and such other agreements.  Subject only to the entry of the Bid Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the other agreements contemplated by this Agreement and the consummation of the transactions contemplated by this Agreement and such other agreements by Seller has been duly authorized by all necessary action on the part of Seller.  Seller has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and subject to the entry of the Sale Order, this Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

(b)    Assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, Permits or consents set forth in Schedule 3.2(b) are waived, made, given or obtained (as applicable), neither the execution and delivery by the Seller of this Agreement or the other agreement to be signed in connection with the consummation of the transactions contemplated under this Agreement, nor the consummation by the Seller of the transactions contemplated under this Agreement, nor performance or compliance by the Seller with any of the terms or provisions hereof or thereof, will (1) conflict with or violate any provision of the Seller's certificate of incorporation, bylaws and any other organizational document (collectively, the "Governing Documents"); (ii) violate any Law or Order applicable to the Seller; (iii) require the consent, notice or other action by any Person under, conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of acceleration, termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of the Assumed Contracts or any Purchased Asset; or (iv) result in the creation of any Lien or Claim on any Purchased Assets.  No consent, approval, Permit, Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to the Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated under this Agreement, except for the requisite Bankruptcy Court approvals.

24

Section 3.3     Title to Assets; Liens.  Except pursuant to the Bankruptcy Code or an order of the Bankruptcy Court, no Purchased Asset is subject to any Liens or Claims that materially restrict in any manner the use, transfer, sale or licensing thereof, and no Third Party. The Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets and the Seller shall convey the Purchased Assets to the Purchaser free and clear of any Liens or Claims except as set forth on Schedule 3.3 of the Seller Disclosure Schedule, and subject to the entry of the Sale Order, at Closing. The Sale Order shall provide that all of such Purchased Assets (including leasehold interests) will be transferred to Purchaser free and clear of Liens or Claims.

Section 3.4     Claims, Litigation and Disputes.  Except as set forth on Schedule 3.4 of the Seller Disclosure Schedule, there are currently no pending, or to the Knowledge of the Seller, threatened, lawsuits, administrative or regulatory Proceedings, actions, Orders, or reviews, or formal complaints or investigations or inquiries, including grand jury subpoenas by any Person, concerning or against Seller or to which the Business or any of the Purchased Assets may be subject or that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated under this Agreement.

Section 3.5     Contracts.  Schedule 3.5 of the Seller Disclosure Schedule, sets forth a true and complete list of all Contracts, including all Services Agreements, and the Cure Amount applicable to each such Contract (the "Contract & Cure Schedule").  The Seller has made available to the Purchaser prior to the execution of this Agreement in accordance with applicable confidentiality agreements, true and complete copies of all Contracts, together with all written notices and amendments relating thereto.  Seller has not, and, to the Knowledge of the Seller, no other party to any Assumed Contract has commenced any action against any of the parties to any such Contract or given or received any written notice of any material default or violation under any such Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amount, except as set forth on Schedule 3.4 of the Seller Disclosure Schedule.

Section 3.6     Intellectual Property.

(a)     Schedule 3.6(a) sets forth a true and complete list of all of the Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements that is used in or necessary for the operation of the Business as currently conducted or as proposed to be conducted, including a true and complete list of all United States, foreign, international and state: (i) Patents, including serial numbers for each filed Patent application and Patent numbers for each issued Patent, included in the foregoing; (ii) Trademark registrations, applications and material unregistered Trademarks included in the foregoing; (iii) domain names, included in the foregoing; and (iv) Copyright registrations, applications and material unregistered Copyrights included in the foregoing.  The listing of IP Agreements set forth on Schedule 2.1(b) includes for each agreement the title, the parties and the date executed, and the Seller has made available to the Purchaser prior to the execution of this Agreement in accordance with applicable confidentiality agreements, true and complete copies of all such IP Agreements, together with all written notices and amendments relating thereto.

(b)      Except as disclosed on Schedule 3.6(b), Seller solely and exclusively owns all Company Owned Intellectual Property and is licensed under or has the right to use all Company

25

Used Intellectual Property, free and clear of all Liens and Claims, and none of such rights will be materially adversely affected by the consummation of the transactions contemplated by this Agreement (subject to any necessary consents for the transfer of any Company Used Intellectual Property). All Company Owned Intellectual Property is valid, subsisting, and enforceable. Seller has not transferred ownership of, or granted any exclusive license with respect to, any Company Owned Intellectual Property to any other Person.

(c)     Each license or agreement relating to Company Used Intellectual Property is valid, binding, and in full force and effect, and enforceable against Seller and, to Seller's Knowledge, the other parties thereto in accordance with its terms. Seller is not in material breach or default under any such license or agreement, and, to Seller's Knowledge, no other party to any such license or agreement is in material breach or default thereunder. Seller has not received any written notice of any breach, default, or dispute under any such license or agreement.

(d)     Except as disclosed on Schedule 3.6(d), there are no inquiries, investigations or Claims, and Seller has not received written notice from any Third Party: (i) alleging infringement, misappropriation or other violation by Seller or the Business of Intellectual Property of any Person; or (ii) challenging or threatening to challenge Seller's right, title, or interest with respect to its ownership or use of, or continued use or right to preclude others from using, any Company Owned Intellectual Property, or the inventorship, validity, enforceability or registrability of any such Intellectual Property.  To the Knowledge of the Seller, (x) Seller has not infringed, misappropriated or otherwise violated any Intellectual Property of any Person and (y) no Person has infringed, misappropriated or otherwise violated any Company Owned Intellectual Property.

(e)     Seller exclusively owns all right, title, and interest in and to all source code and object code comprising the Software, free and clear of any Liens and Claims. Seller has not disclosed, delivered, licensed, or made available the source code for any Software to any Person (other than Service Providers under appropriate confidentiality and assignment obligations).

Section 3.7     Governmental Authorizations. Schedule 3.7 sets forth all Governmental Authorizations used in or required for the operation of the Business.

Section 3.8     Real Property.  The Seller has good and valid leasehold interests to the Leased Real Property set forth on Schedule 3.8, in each case sufficient in all material respects to continue the conduct of the Business in the ordinary course of business and free and clear of all Liens and Claims.  Seller has delivered to Purchaser a true and complete copy of each Assigned Real Property Lease.

Section 3.9     Employment Matters.

(a)     Schedule 3.9 contains a list of all persons who are Employees or independent contractors (specifically including all essential technical contractors) of Seller as of the date hereof, including any Employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full-time or part-time); (iii) hire or retention date; (iv) current annual base salary or hourly wage rate and (v) current commission, bonus or other incentive-based compensation targets.

26

71193/0001-52581497v2

(b)    Seller is not, and has not in the past three (3) years been, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "Union"), and there is not, and has not in the past three (3) years been, any Union representing or purporting to represent any employee of Seller, and, to the Knowledge of Seller, no Union or group of Employees is seeking to organize Employees for the purpose of collective bargaining.  There has not in the past three (3) years been, nor, to the Knowledge of Seller, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar material labor disruption or dispute affecting Seller or any employees of Seller servicing the Business.  Seller has no duty to bargain with any Union.

Section 3.10    Employee Benefits. Schedule 3.10 contains a list of all Employee Plans. Seller is not required to make any contributions to any defined benefit pension for the benefit of its Employees.

Section 3.11    Taxes.

(a)    To the Knowledge of Seller, all material Tax Returns required to be filed by Seller with respect to the Non-Income Taxes for any taxable period ending on or before the Closing Date have been timely filed. Such Tax Returns are true, complete and correct in all material respects.  All material Non-Income Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)    To the Knowledge of Seller, Seller has withheld and paid each material Tax required to have been withheld and paid in connection with amounts paid or owing to the Seller Employee, director, creditor, customer, shareholder or any other party, and complied with all information reporting and backup withholding provisions of applicable Law in all material respects.

(c)    To the Knowledge of Seller, no extensions or waivers of statutes of limitations with respect to any material Taxes or material Tax Returns of or with respect to the Purchased Assets or the Business is outstanding, nor is there pending any request for such a waiver or extension.

(d)    To the Knowledge of Seller, all material deficiencies asserted, or assessments made, against Seller as a result of any examinations by any taxing authority, with respect to any Taxes or Tax Returns of or with respect to the Purchased Assets or the Business, have been fully paid.

(e)    To the Knowledge of Seller, Seller is not a party to any material Claim by any taxing authority with respect to any Taxes or Tax Returns of Seller or with respect to the Purchased Assets or the Business.  There are no pending or threatened material Claims by any taxing authority with respect to any Taxes or Tax Returns of Seller or with respect to the Purchased Assets or the Business.

Section 3.12    Data Privacy and Security. Seller is, and at all times has been, in material compliance with all applicable Privacy Laws. Schedule 3.12 sets forth true, complete, and accurate copies of all current and historical privacy policies and public-facing statements (collectively,

27

"Privacy Policies") regarding any information relating to an identified or identifiable natural person ("Personal Data"), all of which accurately describe Seller's practices, comply with all Privacy Laws, and have been followed in all material respects.

Section 3.13   Disclaimer.  Except for the specific representations and warranties set forth in this Article 3, Purchaser acknowledges that (i) Seller, or any other Person on behalf of Seller, has not made and Seller hereby disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise, and (ii) Seller hereby expressly disclaims any and all liability and responsibility for any representation, warranty, statement or information made or communicated (orally or in writing) to Purchaser or any of its agents and representatives.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as of the date hereof and as of the Closing Date as follows:

Section 4.1   Organization and Good Standing.  The Purchaser is a corporation, duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to conduct its business as it is presently conducted. Purchaser is not a direct or indirect Affiliate, equity holder, director, manager, officer or related party of Seller.

Section 4.2   Authority and Enforceability.  The Purchaser has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser.  The Purchaser has duly and validly executed and delivered this Agreement.  Assuming the due authorization, execution and delivery of this Agreement by the Seller and subject to the entry of the Sale Order, this Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to: (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

Section 4.3   Legal Proceedings.  There is no Proceeding pending or, to the Purchaser's knowledge, threatened against the Purchaser that questions or challenges the validity of this Agreement or that may prevent, delay, make illegal or otherwise interfere with the ability of the Purchaser to consummate any of the transactions contemplated by this Agreement.

Section 4.4   Independent Investigation.   The Purchaser has conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, and financial condition of the Business as it has deemed appropriate.  The Purchaser acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Business for such purpose.  In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of the Seller or their representatives

28

(except the representations and warranties set forth in <u>Article 3</u>).   The Purchaser hereby acknowledges and agrees that the Purchaser is purchasing the Purchased Assets from the Seller "as is" and "where is".  Nothing in this <u>Section 4.4</u> shall be deemed to constitute a waiver of fraud.

### ARTICLE 5
### COVENANTS

Section 5.1    <u>Access and Investigation</u>.  Until the Closing, the Seller shall provide the Purchaser and its representatives with, upon reasonable advance notice from the Purchaser, reasonable access during normal business hours and without unreasonable interference with the operation of the Business to (i) such materials and information about the Business as the Purchaser may reasonably request, and permit the Purchaser and its representatives to make copies of books and records as reasonably requested and (ii) specified members of management of the Business as the Purchaser may reasonably request.

Section 5.2    <u>Operation of the Business.</u>

(a)    Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case and the Seller obligations as debtor or debtor-in-possession under the Bankruptcy Code (it being understood that no provision of this <u>Section 5.2</u> will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, delayed or conditioned); or (iii) pursuant to any orders approving debtor in possession financing and/or use of cash collateral entered by the Bankruptcy Court in any Chapter 11 Case, Seller will not:

(i)    amend its Governing Documents (whether by merger, consolidation or otherwise) in a manner materially adverse to the Purchaser;

(ii)    split, combine or reclassify its shares of capital stock or membership interests or declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect thereof;

(iii)    incur any capital expenditures or any obligations or liabilities in respect thereof;

(iv)    (A) purchase or acquire any indebtedness, debt securities or equity securities of any Person, or (B) make any loans, advances or capital contributions to, or investments in, any other Person;

(v)    change its methods of accounting, except as required by concurrent changes in GAAP;

(vi)    waive or release any material right or claim of the Business (other than any right or claim to the extent relating to any Excluded Assets or Excluded Liabilities), other than in the ordinary course of business consistent with past practice;

71193/0001-52581497v2

(vii)    sell, lease, transfer, license or otherwise dispose of, abandon or permit to lapse, fail to take any action necessary to maintain, enforce or protect, or permit or create any Lien or Claim on, any assets or properties (other than Excluded Assets), other than (A) the sale of inventory or (B) the disposition of obsolete equipment, in each case of clauses (A) and (B) in the ordinary course of business consistent with past practice;

(viii)    incur or suffer to exist any indebtedness for borrowed money except any such indebtedness that is an Excluded Liability;

(ix)    except as required by applicable Law or an Employee Plan, (A) grant any severance, retention or termination pay to, or enter into or amend any severance, retention, termination, employment, consulting, bonus, change in control or severance agreement with, any Service Provider, (B) increase the compensation or benefits provided to any Service Provider, (C) grant any incentive awards to, or discretionarily accelerate the vesting or payment of any such awards held by, any Service Provider, (D) establish, adopt, enter into or amend any Employee Plan, or (E) terminate the employment of any Service Provider other than for cause prior to consultation with the Purchaser;

(x)    grant any right (including any distribution or exploitation right) or interest (whether ownership, security, participation or otherwise) in or to any of the Purchased Assets or permit or authorize any Third Party or other Person to grant any right (including any distribution or exploitation right) or interest (whether ownership, security, participation or otherwise) in or to any of the Purchased Assets;

(xi)    transfer or consent to the transfer of any Purchased Asset to any location other than its location as of the date of this Agreement; or

(xii)    agree in writing to take any of the foregoing actions.

Section 5.3    Employee Matters.

(a)    On or before the Closing, the Purchaser, in its sole and absolute discretion, may extend a written offer of at will employment to the employees listed in a schedule to be provided to the Seller, and who are not on long-term disability or other long-term (in excess of six (6) months) leave of absence as of immediately prior to the Closing Date (collectively, the "Employees") (which schedule will be updated by the Seller prior to the Closing Date by deleting those individuals no longer employed in connection with the Business).  Effective as of the Closing Date, the Purchaser in its sole and absolute discretion may hire each Employee who timely accepts an offer of employment extended by the Purchaser (such Employees, the "Transferred Employees").

(b)    Without limiting the generality of Section 10.5, nothing in this Section 5.3, express or implied, (i) is intended to or shall confer upon any Person, including any current or former Service Provider, other than the parties hereto and their respective successors and assigns, any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, (ii) shall establish or constitute an amendment, termination or modification of, or an undertaking to establish, amend, terminate or modify, any benefit plan, program, agreement or arrangement, or (iii) shall alter or limit the ability of Purchaser or any of its Affiliates to amend, modify or terminate

30

any benefit plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them.

Section 5.4    Consents, Filings and Introductions to Critical Vendor Contacts; Commercially Reasonable Efforts.

(a)    Subject to the terms and conditions of this Agreement, the parties will use their respective commercially reasonable efforts: (i) to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things reasonably necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement; and (ii) as promptly as practicable after the date of this Agreement, to obtain all Governmental Authorizations from, and make all filings with, all Governmental Authorities, and to obtain all other consents, waivers, approvals and other authorizations from, all other Third Parties, that are necessary or advisable in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, including, without limitation, any approvals or authorizations required by the California Attorney General to enable the Purchaser to operate the Business in the State of California.  Without limiting the foregoing, prior to or at the Closing, the Seller shall prepare and deliver to the Purchaser executed versions of any and all instruments reasonably requested by the Purchaser in connection with the transfer of any Governmental Authorization relating to any Purchased Asset and similar instruments as required by applicable Law in the United States or any other country where Seller is the owner of or has submitted a request for a Governmental Authorization relating to a Purchased Asset, each in form and substance reasonably satisfactory to the Purchaser.

(b)    The Seller, on the one hand, and the Purchaser, on the other hand, will promptly notify the other of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement, and will permit the other party to review in advance any proposed communication by such party to any Governmental Authority.  Neither the Seller, on the one hand, nor the Purchaser, on the other hand, will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the transactions contemplated by this Agreement unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate at such meeting.  The Seller, on the one hand, and the Purchaser, on the other hand, will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing.  The Seller, on the one hand, and the Purchaser, on the other hand, will provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

(c)    The Seller will promptly notify the Purchaser of any written communication it or any of its Affiliates receives from any other Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

(d)    The Seller and the Trustee shall use all commercially reasonable efforts to promptly introduce the Purchaser and its representatives to the Seller's contacts at Transec, Avion,

31

Stripe, and any other vendor, service provider, payment facilitator or other Third Party with whom the Purchaser determines, in its reasonable discretion, it needs to communicate prior to the Closing in order to be able to operate the Business following the Closing (each, a "**Critical Vendor Contact**"). Such introductions shall include, without limitation, providing contact information, making email introductions and a request for a meeting (whether in person, by telephone or by videoconference) and, to the extent reasonably requested by the Purchaser, participating in initial discussions between the Purchaser and any such Critical Vendor Contact. The Seller and the Trustee shall cooperate with the Purchaser in providing any information, documentation or authorizations reasonably necessary to facilitate such introductions and communications; provided, that the Purchaser shall treat any Confidential Information obtained through such introductions in accordance with Section 5.6 of this Agreement. The Purchaser shall provide the Seller with reasonable advance notice identifying the Critical Vendor Contacts with whom the Purchaser seeks introductions, and the Seller and the Trustee shall use commercially reasonable efforts to arrange such introductions within five (5) Business Days of receipt of such notice; *provided*, *however*, that Seller and the Trustee shall endeavor to make such introductions and request initial meetings with Transec, Avion, and Stripe within seven (7) Business Days of the date of this Agreement.

Section 5.5    Supplements to Disclosure Schedules.  The Seller may, from time to time prior to the Closing by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) in order to disclose any matter which, if occurring prior to the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement.  Unless the Purchaser delivers a notice of termination with respect to such matter as contemplated by Section 7.1(a)(vii), within five (5) Business Days of the receipt by the Purchaser of any such supplement or amendment to the Schedules pursuant to this Section 5.5, then the Purchaser will have automatically be deemed to have waived (i) any and all rights to terminate this Agreement pursuant to Section 7.1(a)(ii) solely by reason of any breach or failure by the Seller to perform any of their representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure is expressly and specifically identified in the contents of such supplement or amendment, (ii) any and all rights to terminate this Agreement pursuant to Section 7.1(a)(vii) solely with respect to such supplement, amendment or update delivered to the Purchaser, and (iii) the Closing condition set forth in Section 6.1(a) solely by reason of the failure of any representation or warranty of the Seller to be true and correct on and as of the Closing in accordance with Article 3, which failure is expressly and specifically identified in the contents of such supplement or amendment.

Section 5.6    Confidentiality.  Effective upon the Closing, any written confidentiality agreements between Seller and the Purchaser shall terminate.  From and after the Closing the Confidential Information and trade secrets included in the Purchased Assets ("Business Confidential Information") will be the confidential information of Purchaser.  Seller will not use the Business Confidential Information for any reason (except to the extent permitted pursuant to the immediately following sentence). From and after the Closing, Seller agrees to keep confidential and not disclose the Business Confidential Information, except to the extent that (i) Purchaser shall have provided its prior written consent, (ii) such information has otherwise been made public by Purchaser, or (iii) Seller is required by applicable Law (including, in connection with the

32

Bankruptcy Case) to divulge or disclose any such information (in which case Seller shall promptly notify Purchaser, to the extent legally permitted, in advance of disclosing such information and use commercially reasonable efforts to cooperate with Purchaser to limit such disclosure, to the extent permitted under applicable Law).

Section 5.7   Public Announcements.  Prior to the Closing, other than in connection with the Chapter 11 Case and filings made with the Bankruptcy Court with respect thereto, neither the Purchaser, on the one hand, nor the Seller, on the other hand, will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party, unless required by applicable Law.

Section 5.8   Further Actions.  Subject to the other express provisions of this Agreement, upon the request of either the Purchaser, on the one hand, or the Seller, on the other hand, the other party will execute and deliver such other documents, instruments and agreements, and take such as other actions, as the requesting party may reasonably request or require for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement, including to effectuate the complete transfer of the Purchased Assets to Purchaser. For the avoidance of doubt, the obligations set forth in this Section 5.8 may require, among other things and without limitation, upon Purchaser's request and at no additional cost to Purchaser, that Seller transfer, or cause its Affiliates to transfer, assets to Purchaser if it is discovered at any time that such assets are (or should be) Purchased Assets.

Section 5.9   Bankruptcy Court Matters.

(a)   The Purchaser and the Seller will use their respective good faith and commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as practicable after entry by the Bankruptcy Court, provided Purchaser is the Successful Bidder.

(b)   The Seller shall undertake the following, provided Purchaser is the Successful Bidder:

(i)   as promptly as possible, but in no event later than fifteen (15) days after entry of the Sale Order, the Seller shall consummate the Closing (the "Outside Date");

(ii)   the Seller shall deliver to the Purchaser, and its counsel, promptly after the same is available, copies of all Orders entered by the Bankruptcy Court in the Chapter 11 Case, pleadings, motions, applications, judicial information, financial information and other documents to be filed with the Bankruptcy Court (collectively, the "Chapter 11 Documents") that affect or could reasonably be expected to affect the Purchaser, Purchased Assets, Assumed Liabilities or Business, filed by or on behalf of the Seller with the Bankruptcy Court in the Chapter 11 Case or distributed to any official committee appointed in the Chapter 11 Case;

(iii)   the Seller will promptly take such actions as are reasonably requested by the Purchaser to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Seller of its obligations under this Agreement and all other agreements, instruments,

33

71193/0001-52581497v2

certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that the Purchaser is a good faith buyer under section 363(m) of the Bankruptcy Code;

(iv)     if an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from either the Bid Procedures Order or the Sale Order, the Seller will promptly notify the Purchaser of such appeal, petition, motion or stay request and the Seller, with input from the Purchaser, shall use commercially reasonable efforts to defend such appeal.  Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and the Purchaser, in its sole and absolute discretion, waives in writing the condition set forth in Section 6.1(c) that the Sale Order be a Final Order;

(v)     the Seller and the Purchaser shall comply with all of their respective obligations under the Bid Procedures Order and Sale Order (after the entry of each such order by the Bankruptcy Court); and

(vi)     the Seller shall comply (or obtain an order waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement.  The Seller shall serve on all required Persons, including: (i) all Persons who are known to possess or assert a Claim or Lien against or interest in the Purchased Assets; (ii) all applicable Governmental Authorities; (iii) all other Persons required by any order of the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules; and (iv) using commercially reasonable efforts to serve any other Persons that the Purchaser reasonably may request, any notice of the motions, hearings, or orders necessary to comply with its obligations under this Section 5.9 and to consummate the transactions contemplated hereby.

Section 5.10    Bankruptcy Court Approval.

(a)     The Purchaser and the Seller acknowledge that, under the Bankruptcy Code, the sale of Purchased Assets is subject to approval of the Bankruptcy Court.  The Purchaser and the Seller acknowledge that to obtain such approval, the Seller must demonstrate that it has taken reasonable steps to obtain the highest or best value possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Purchased Assets to prospective bidders, entertaining higher or better offers from qualified bidders and, if necessary, conducting an Auction and selling the Purchased Assets to another qualified bidder.

(b)     Consistent with its fiduciary duties to elicit the highest and best offer for the Purchased Assets and to conduct an Auction, if necessary, notwithstanding any provision in this Agreement to the contrary, the Trustee on behalf of the Seller and its representatives may, following the entry of the Bid Procedures Order, solicit, encourage and negotiate higher or better offers for the Purchased Assets under the terms hereof and of the Bid Procedures Order.

Section 5.11    Assumption & Rejection of Executory Contracts.

34

71193/0001-52581497v2

(a)    Schedule 3.5 of the Seller Disclosure Schedule (i.e., the Contract & Cure Schedule) sets forth a list of all Contracts to which Seller is a party and the Assumed Cure Amounts for each such Contract.  Schedule 5.11(a) (the "Assumed Contract Schedule") sets forth a list of all Executory Contracts that the Purchaser has advised the Seller it wants the Seller to assume and assign to the Purchaser under section 365 of the Bankruptcy Code and in accordance with Section 5.11(b) below, which the Purchaser will provide to the Seller no later than the bid deadline for competing bids as set forth in the Bid Procedures Order.  Upon the Purchaser's delivery of the Assumed Contract Schedule to Seller, the Seller shall expeditiously file a motion with the Court to reject any and all Executory Contracts that are not included in the Assumed Contract Schedule, effective as of February 28, 2026.  At any time prior to the Closing, the Purchaser, in its sole and absolute discretion, may amend the Assumed Contract Schedule to remove any Executory Contract in accordance with the conditions concerning notice and service to contract counterparties set forth in the Bid Procedures and Bid Procedures Order.  Unless the Bankruptcy Court orders otherwise, each Executory Contract included on the Assumed Contract Schedule will be deemed to have been assigned to the Purchaser and become an Assumed Contract on the date (the "Assumption Effective Date") that is the later of: (i) the Closing Date, or (ii) contemporaneously with the resolution of any objections to the assumption and assignment of such Executory Contract or to a proposed Cure Amount.

(b)    Subject to Section 5.17, each Executory Contract that is listed on Schedule 3.8 of the Seller Disclosure Schedule, but not the Assumed Contract Schedule, will be rejected by the applicable Seller, subject to approval by the Bankruptcy Court.  Each Executory Contract that is listed on Schedule 3.5 of the Seller Disclosure Schedule but not the Assumed Contract Schedule will be deemed to be an Excluded Contract under this Agreement.

(c)    The Seller and the Purchaser will comply with the procedures set forth in the Assumption Procedures and the Bid Procedures Order with respect to the assumption and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this Section 5.11.

(d)    No designation of any Executory Contract for assumption and assignment or rejection in accordance with this Section 5.11, the Bid Procedures, the Bid Procedures Order or the Sale Order will give rise to any right to any adjustment to the Purchase Price.

(e)    If prior to the Closing, it is discovered that a Contract should have been listed on Schedule 3.5 of the Seller Disclosure Schedule but was not so listed (any such Contract, a "Previously Omitted Contract"), the Seller shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify the Purchaser in writing of such Previously Omitted Contract and provide the Purchaser with a copy of such Previously Omitted Contract and the Cure Amount (if any) in respect thereof.  The Purchaser shall thereafter deliver written notice to the Seller, no later than five (5) Business Days following such notice of such Previously Omitted Contract from the Seller, if the Purchaser elects to so include such Previously Omitted Contract on the Assumed Contract Schedule.

(f)    If the Purchaser includes a Previously Omitted Contract on the Assumed Contract Schedule in accordance with Section 5.11(e), the applicable Seller shall file and serve a notice on the contract counterparties to such Previously Omitted Contract notifying such

35

counterparties of Seller's intention to assume and assign to the Purchaser such Previously Omitted Contract, including the proposed Cure Amount (if any).  Such notice shall provide such contract counterparties with ten (10) Business Days to object, in writing, to Seller and the Purchaser to the assumption of its Contract.  If such counterparties, Seller and the Purchaser are unable to reach a consensual resolution with respect to the objection, the Seller will seek an expedited hearing before the Bankruptcy Court to seek approval of the assumption and assignment of such Previously Omitted Contract.  If no objection is timely served on Seller and the Purchaser, then such Previously Omitted Contract shall be deemed assumed by Seller and assigned to the Purchaser pursuant to the Sale Order.  The Seller and the Purchaser shall execute, acknowledge and deliver such other instruments and take commercially reasonable efforts as are reasonably practicable for the Purchaser to assume the rights and obligations under such Previously Omitted Contract.

Section 5.12    Intentionally Omitted.

Section 5.13    Payments Received.  The Seller, on the one hand, and the Purchaser, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, but no later than five (5) Business Days following receipt, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts. Without limiting the generality of the foregoing, the Seller (prior to the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing any Chapter 11 Case) agrees to cooperate with the Purchaser, at the sole cost of the Purchaser, to direct payors to make all payments due to Seller after the Closing in respect of the Business, which payments constitute Purchased Assets (the "Business Payments") to the Purchaser's account or address, as applicable, and otherwise reasonably assist the Purchaser to ensure that such Business Payments are made to such account.  The Seller, on the one hand, and the Purchaser, on the other hand, hereby agrees that any payments mistakenly received by it or its respective Affiliates shall be promptly transferred and delivered back to the other party or its Affiliate, as applicable.

Section 5.14    Cessation of Use of Acquired Intellectual Property.  Notwithstanding anything to the contrary, (i)  Seller acknowledges and agrees that, from and after the Closing, the Seller shall not have any right, title or interest in or to any Acquired Intellectual Property (including Seller Names and Marks, other than in connection with continuing the Seller's names in the Chapter 11 Case) and (ii) from and after the Closing, the Seller shall cease and discontinue any and all use or other exploitation of any and all Acquired Intellectual Property (including all Seller Names and Marks).

Section 5.15    Transfer of Permits and Governmental Authorizations.  From and after the date hereof, and for up to three (3) months after the Closing (subject to the prior the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing all of the Chapter 11 Case) and, subject to the Seller having appropriate levels of resources and personnel after the Closing, the Seller, at the sole expense of the Purchaser, shall reasonably cooperate to transfer to Purchaser as of the Closing (or as soon as reasonably practicable thereafter) all Governmental Authorizations included in the Purchased Assets.

36

Section 5.16    Excluded Contracts.  From and after the Closing, the Purchaser may, at its sole and absolute discretion and at its sole expense, request for the Seller to maintain in effect any Excluded Contract for up to three (3) months after the Closing (subject to the prior the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing all of the Chapter 11 Case), for the purposes of passing through the benefits of such Excluded Contract to the Purchaser, and (i) subject to the Seller having appropriate levels of resources and personnel, the Seller shall consider in good faith any such request and use commercially reasonable efforts to maintain in effect such Excluded Contract and not reject such Excluded Contract, (ii) the Purchaser and the Seller (subject to the Seller having appropriate levels of resources and personnel) shall use commercially reasonable efforts to agree on arrangements for the purposes of passing through the benefits of such Excluded Contract to the Purchaser, and (iii) any such arrangements described in the foregoing shall be at the sole expense of the Purchaser.

Section 5.17    Assignability of Certain Contracts.  To the extent that the assignment to Purchaser of any Assumed Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained; provided, however, that the parties will use their commercially reasonable efforts, before the Closing, to obtain all such consents.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

Section 6.1    Conditions to the Obligation of the Purchaser.  The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction, if any, or thereafter as a result of the Successful Bidder failing to close) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part, in its sole and absolute discretion), unless expressly waived in writing by the Purchaser:

(a)    Accuracy of Representations and Warranties.  The representations and warranties of the Seller in Article 3 shall be true and correct in all material respects as of the Closing, other than representations and warranties which are qualified by materiality or similar qualifications, which shall be true and correct in all respects as of the Closing, in each case other than representations and warranties made as of a specific date which shall be true and correct in all material respects or all respects, as applicable, as of such date;

(b)    Performance of Covenants.  All of the covenants and obligations that the Seller is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects, including, for the avoidance of doubt, satisfying the requirements in this Section 6.1;

(c)    No Action.  There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

71193/0001-52581497v2

(d)     Bid Procedures Order.  The Bid Procedures Order must be a Final Order;

(e)     Sale Order.  The Sale Order must be a Final Order and must be in form and content reasonably acceptable to the Purchaser in its sole and absolute discretion;

(f)     Closing Deliverables.   The Seller must have delivered or caused to be delivered each deliverable and document under Section 2.10(a);

(g)     WebPack Client Closing Threshold. The number of WebPack Clients on the Closing Date Statement shall not be less than the WebPack Client Closing Threshold;

(h)     Performance Requirements.   The Seller must satisfy the following performance requirements:

(A)     Restoration of Subscriber Billing Functionality. The Seller must demonstrate the technical capability to migrate all subscription metadata and PCI-compliant tokens free and clear to the Purchaser's controlled environment. Satisfaction of this requirement shall be subject to a successful "dry-run" migration of a sample set of non-Personal Data to ensure minimal disruption to recurring revenue.

(B)     Disclosure of Withheld Funds and Transactional Audit. The Seller shall provide a (i) comprehensive schedule of all donor funds currently withheld, reserved or frozen by Stripe, and (ii) total gross donation volume processed via Stripe in calendar year 2025 specifically associated with the WebPack Clients and Non-WebPack Clients listed on the Closing Statement.

Section 6.2     Conditions to the Obligations of the Seller.  The obligation of the Seller to perform any obligations hereunder, including to consummate the transactions contemplated by this Agreement, is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction, if any, or thereafter as a result of the Successful Bidder failing to close) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a)     Accuracy of Representations and Warranties.   The representations and warranties of the Purchaser in Article 4 shall be true and correct in all material respects as of the Closing, other than representations and warranties which are qualified by materiality, or similar qualifications, which shall be true and correct in all respects as of the Closing, in each case other than representations and warranties made as of a specific date which shall be true and correct in all material respects or all respects, as applicable, as of such date

(b)     Performance of Covenants.   All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)     No Action.   There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

38

(d)    Bid Procedures Order.  The Bid Procedures Order must be a Final Order;

(e)    Sale Order.  The Sale Order must be a Final Order; and

(f)    Closing Deliverables.  The Purchaser must have delivered or caused to be delivered each deliverable and document under Section 2.10(b).

### ARTICLE 7
### TERMINATION

Section 7.1    Termination Events.

(a)    This Agreement may, by written notice given before the Closing, be terminated:

(i)    by mutual consent of the Purchaser and the Seller;

(ii)    by the Purchaser (so long as the Purchaser is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Seller's representations, warranties or covenants contained in this Agreement which would result in the failure of the condition set forth in Section 6.1(a) or Section 6.1(b), as applicable, to be satisfied, and which breach has not been cured within twenty (20) days after written notice of such breach has been delivered to the Seller from the Purchaser or cannot be cured by the Outside Date;

(iii)    by the Seller (so long as the Seller is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Purchaser's representations, warranties or covenants contained in this Agreement which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), as applicable, to be satisfied, and which breach has not been cured within twenty (20) days after written notice of such breach has been delivered to the Purchaser from the Seller or cannot be cured by the Outside Date;

(iv)    by either the Purchaser or the Seller, if there is in effect a nonappealable Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(a)(iv) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 7.1(a)(iv) occurring;

(v)    by Purchaser, if any secured creditor of Seller obtains relief from the stay to foreclose on or enforce its rights against any material portion of the Purchased Assets;

(vi)    by the Purchaser if (a) any Chapter 11 Case is dismissed or converted into a case under chapter 7 of the Bankruptcy Code or (b) an examiner with expanded powers or trustee is appointed in any Chapter 11 Case;

39

(vii)    within five (5) Business Days of the receipt by the Purchaser of a supplement or amendment to the Seller Disclosure Schedule in accordance with Section 5.5 if such supplement or amendment is necessary for the Seller to be able to satisfy the condition precedent to Closing in Section 6.1(a);

(viii)    by the Purchaser if the Closing on the sale to the Purchaser does not occur by the Outside Date; or

(ix)    by the Trustee on behalf of the Seller, in the exercise of his fiduciary duties in accordance with Section 5.10(b) hereof and the Bid Procedures Order.

(b)    This Agreement shall terminate automatically in the event that (i) an Alternative Transaction has been consummated following approval by the Bankruptcy Court, or (ii) the Purchaser is not chosen at the Auction, if any, to be the Successful Bidder.

Section 7.2    Effect of Termination.

(a)    If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any other party or its Affiliates, except that Section 2.6 (*Deposit*), Section 5.7 (*Public Announcements*), Article 10 (*General Provisions*) and this Section 7.2 (*Effect of Termination*) shall remain in full force and survive any termination of this Agreement.  Notwithstanding the foregoing, in the event this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.

**ARTICLE 8**
**NO SURVIVAL**

Section 8.1    No Survival of Representations and Warranties and Certain Covenants.  Each of the representations, warranties and covenants (other than covenants that, by their terms, survive the Closing or termination of this Agreement) in this Agreement or any agreement or certificate to be executed or delivered in connection with the transactions contemplated by this Agreement shall terminate at the Closing or upon termination of this Agreement pursuant to Section 7.1 and, following the Closing or the termination of this Agreement, as the case may be, no party shall make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Section 7.2.

**ARTICLE 9**
**TAX MATTERS**

Section 9.1    Transfer Taxes.

(a)    Any sales, use, *ad valorem*, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and

40

71193/0001-52581497v2

fees ("Transfer Taxes"), arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement, including expenses and fees relating to registering Acquired Intellectual Property in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the Purchased Assets or the Seller, shall be borne by the Purchaser. The amount of Transfer Taxes shall be estimated as of the Closing Date and if any Transfer Taxes are due, the Purchaser shall promptly pay the applicable Tax authorities such Transfer Taxes and provide evidence of timely payment of such Transfer Taxes to the Seller; provided, however that final payments with respect to the Transfer Taxes that are not able to be calculated as of the Closing Date shall be calculated promptly after the Closing, and the Purchaser shall promptly pay the applicable Tax authorities such Transfer Taxes and provide evidence of timely payment of such Transfer Taxes to the Seller. Any Tax Returns that must be filed in connection with any Transfer Taxes shall be prepared by the Seller pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the Seller shall deliver such Tax Returns for the Purchaser's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten (10) Business Days prior to the applicable due date. The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes.

Section 9.2    Proration Items. Personal property Taxes, real property Taxes and other similar Taxes with respect to the Purchased Assets (the "Proration Items") for any Taxable period beginning before the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between the Purchaser and the Seller as of the Closing Date. The amount of the Proration Items attributable to the Seller shall be equal to the amount of Tax for the period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the period through and including the Closing Date and the denominator of which shall be the entire number of days in the period. For purposes of allocating all other Taxes with respect to the Purchased Assets ("Non-Proration Items") for any Straddle Period, such Taxes shall be allocated between the pre-Closing portion of such Straddle Period and the post-Closing portion of such Straddle Period based on an interim closing of the books at the end of the day on the Closing Date. The Seller shall bear any Non-Proration Items allocable to the pre-Closing portion of any Straddle Period and any other unpaid Taxes with respect to the Purchased Assets for Tax periods ending on or prior to the Closing Date.

**ARTICLE 10**
**GENERAL PROVISIONS**

Section 10.1   Notices. All notices and other communications under this Agreement must be in writing and are deemed duly delivered when: (a) delivered, if delivered personally or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile with confirmation of transmission by the transmitting equipment (or, the first Business Day following such transmission if the date of transmission is not a Business Day) or by email; or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number or individual as a party may designate by notice to the other party):

41

If to the Seller:          Flipcause, Inc.
                           c/o McCarter & English, LLP
                           100 Mulberry Street, Newark, NJ 07102
                           Attn: Jeffrey T. Testa, Chapter 11 Trustee
                           Email: jtesta@mccarter.com

with a copy
(which will not
constitute notice) to:     Cole Schotz PC
                           25 Main Street
                           Hackensack, NJ 07601
                           Attn:   Ryan Jareck, Esq.
                           Email: rjareck@coleschotz.com

If to the Purchaser:       S4NP Corporation
                           979 Woodland Pwky
                           Suite 101
                           Mailbox 2034
                           San Marcos, CA 92069
                           Attn: Danny Vivier
                           Email: danny@evermore-ventures.com

with a copy
(which will not
constitute notice) to:     Pashman Stein Walder Hayden, P.C.
                           824 North Market Street
                           Suite 800
                           Wilmington, DE 19801
                           Attn.:   Joseph C. Barsalona II
                           Email:   jbarsalona@pashmanstein.com

Section 10.2   Amendment.   Except as otherwise expressly contemplated by this Agreement, this Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each party hereto and that identifies itself as an amendment to this Agreement.

Section 10.3   Waiver and Remedies.   The parties may, but are not required to: (a) extend the time for performance of any of the obligations or other acts of the other party to this Agreement; (b) waive any inaccuracies in the representations and warranties of the other party to this Agreement contained in this Agreement; or (c) waive compliance with any of the covenants or conditions for the benefit of such party contained in this Agreement. Subject to Section 5.5, (i) any such extension or waiver by a party to this Agreement will be valid only if set forth in a written document signed on behalf of the party against whom the extension or waiver is to be effective; (ii) no extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant or condition, as the case may be, other than that which is specified in the written extension or waiver; and (iii) no failure or delay by a party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant

42

71193/0001-52581497v2

to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy. Notwithstanding anything to the contrary herein, any deadline set forth in this Agreement that does not fall on a Business Day shall automatically be extended to the next Business Day.

Section 10.4   Entire Agreement.  This Agreement (including the Schedules and Exhibits hereto and the documents and instruments referred to in this Agreement that are to be delivered at the Closing) constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement.

Section 10.5   Assignment, Successors and No Third Party Rights.  This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under chapter 11 or chapter 7 of the Bankruptcy Code and any entity appointed as a successor to Seller pursuant to a confirmed chapter 11 plan).  No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations to any Affiliate of the Purchaser so long as the Purchaser remains responsible for the performance of the delegated obligation.  The Purchaser may, without the written consent of Seller, designate one or more Affiliates, including any special purpose entities that may be organized by or at the direction of the Purchaser for such purpose, to bid at the Auction, if any, or take title to, the Purchased Assets or any portion thereof at Closing and operate the business going forward, and upon written notice to the Seller of any such designation by the Purchaser, the Seller agree to execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, the Purchaser's designees.  Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this Section 10.5.

Section 10.6   Severability.  In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.

Section 10.7   Exhibits and Schedules.  The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement.  The Seller Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article 3.

Section 10.8   Interpretation.  In the negotiation of this Agreement, each party has received advice from its own attorney.  The language used in this Agreement is the language chosen by the

43

parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against either party because that party or its attorney drafted the provision.

Section 10.9    Expenses.    The Seller shall pay their own direct and indirect expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.  The Purchaser shall pay its own direct and indirect expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.

Section 10.10    Limitation on Liability.    Notwithstanding any other provision of this Agreement to the contrary, in no event will any party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of the conduct of such party pursuant to this Agreement, regardless of whether the nonperforming party was advised of the possibility of such damages or not.

Section 10.11    Specific Performance.    The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by either party in accordance with such party's specific terms or were otherwise breached, or threatened to be breached, by such party.  The parties accordingly agree that, in addition to any other remedy to which a non-breaching party is entitled at law or in equity as a remedy for any such breach or threatened breach, the non-breaching party is entitled to equitable relief, without proof of actual damages, including an injunction or injunctions or Orders for specific performance to prevent breaches of the terms of this Agreement against the breaching party and to enforce specifically the terms and provisions hereof; provided that, the non-breaching party shall only be entitled to injunctive relief if such non-breaching party is not otherwise in breach of this Agreement or if the breaching party is not otherwise entitled to terminate this Agreement. Each party expressly waives any requirement that the other party obtains any bond or provides any indemnity or similar instrument in connection with or as a condition to any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

Section 10.12    Governing Law; Jurisdiction; Waiver of Jury Trial.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT FOR SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION, AND THEREAFTER, IN THE FEDERAL OR STATE COURTS OF COMPETENT JURISDICTION LOCATED IN DELAWARE, AND EACH OF THE PARTIES HERETO IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, GENERALLY AND UNCONDITIONALLY, AND WAIVES ANY OBJECTIONS AS TO

44

VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE AND SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION, THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT.

Section 10.13 No Joint Venture. Nothing in this Agreement creates a joint venture or partnership between the parties. This Agreement does not authorize any party hereto (a) to bind or commit, or to act as an agent, employee or legal representative of, any other party, except as may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of any other party. Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 10.13.

Section 10.14 Counterparts; Signatures. The parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Agreement is effective upon delivery of one executed counterpart from each party to the other party. The signatures of all parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

(a) Preservation of Records; Post-Closing Access and Cooperation. For a period equal to the greater of: (i) twelve (12) months after the Closing Date; and (ii) the closing of the Chapter 11 Case by the Bankruptcy Court (the "Post-Closing Access and Cooperation Period"), the Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records in its possession that are Purchased Assets (including any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations) relating to the operation of Business and the Purchased Assets prior to the Closing Date.

(b) During the Post-Closing Access and Cooperation Period, subject to existing confidentiality agreements and upon reasonable advance notice from the Seller (or its designee or successor), the Purchaser shall afford promptly, at no cost to Seller, to the Seller and its representatives (or its designee or successors, which may include the trustee of a liquidating trust) reasonable access during normal business hours with a representative of Purchase present, to the offices, facilities, books, records, officers and employees of the Business as reasonably requested by the Seller for the purpose of winding-up its affairs and finalizing the administration of the Chapter 11 Case or in furtherance of the purposes set forth herein; provided, that such access does not unreasonably interfere with the Purchaser's business operations or involve the incurrence of material fees and expenses. During the Post-Closing Access and Cooperation Period, the Purchaser shall permit former employees of the Seller to cooperate with the Seller (or, its designee or successors) after the Closing, in furnishing information, testimony and other reasonable assistance with respect to the Business or Purchased Assets for periods prior to the Closing Date

71193/0001-52581497v2

46

in connection with any action or proceeding relating to the Chapter 11 Case or in furtherance of the purposes set forth herein; provided, that such access does not unreasonably interfere with the Purchaser's business operations.

[SIGNATURES APPEAR ON THE FOLLOWING PAGES]

71193/0001-52581497v2

The parties have executed and delivered this Agreement as of the date first set forth in this Agreement.

SELLER:

**FLIPCAUSE, INC.**, a Delaware corporation

By: _____

Name:  Jeffrey T. Testa

Title:  Chapter 11 Trustee

[Signature Page to Asset Purchase Agreement]

71193/0001-52581497v2

**PURCHASER:**

**S4NP CORPORATION**, a Delaware corporation

By: _Scott Rassatt_
Scott Rassatt (Feb 24, 2026 19:27:22 PST)
Name:   Scott Rassatt
Title:    President

By: _____
Daniel Vivier (Feb 24, 2026 02:20:49 PST)
Name:   Daniel Vivier
Title:    Treasurer and Secretary

[Signature Page to Asset Purchase Agreement]

A-1

## EXHIBIT A

## FORM OF BILL OF SALE

71193/0001-52581497v2

## EXHIBIT A

FORM OF BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is made as of the ___ day of _____, 2026, by and between Flipcause, Inc., a Delaware corporation ("Seller"), to and in favor of **[___]**, a **[State] [Entity]**, or one or more of its designees (the "Purchaser").  The Seller and the Purchaser are each a "Party" hereto and are collectively referred to herein as the "Parties".  All capitalized terms that are not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement (as defined below).

1.       WHEREAS, the Seller and the Purchaser have entered into that certain Asset Purchase Agreement, dated **[_____]**, 2026 (the "Purchase Agreement"), pursuant to which the Seller agreed to sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser agreed to purchase and acquire from the Seller, all of the Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens and Claims (other than the Assumed Liabilities), in exchange for consideration equal to the Purchase Price (the "Sale");

2.       WHEREAS, the Bankruptcy Court entered into that certain Sale Order on _____, 2026, approving the sale on the terms set forth in the Purchase Agreement and in the Sale Order; and

WHEREAS, pursuant to Section 2.10 of the Purchase Agreement, the Seller has agreed to execute and deliver this Bill of Sale to effectuate the sale, transfer, assignment, conveyance and delivery of the Purchased Assets to Purchaser and its successors and assigns.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

For and in consideration of payment by the Purchaser to the Seller of the Purchase Price, the Seller hereby sells, transfers, assigns, conveys and delivers to the Purchaser, its successors and assigns, all of the Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens and Claims (other than the Assumed Liabilities), the same to be held and enjoyed by the Purchaser for its use and enjoyment, and for the use and enjoyment of its successors, assigns and other legal representatives.

1.       Subject to the other express provisions of this Bill of Sale and the Purchase Agreement, upon the request of either the Purchaser, on the one hand, or the Seller, on the other hand, the other party will execute and deliver such other documents, instruments, and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Bill of Sale and the Purchase Agreement and the transactions contemplated by this Bill of Sale and the Purchase Agreement. Without limiting the generality of the foregoing, the Seller covenants and agrees that at any time and from time to time after the date hereof, Seller will take or cause to be taken all steps necessary to establish the record of the Purchaser's right, title and interest in and to the Purchased Assets and, at the reasonable request of Purchaser, to execute and deliver or cause to be delivered further instruments of transfer and assignment and take or cause to be taken such other action as Purchaser may reasonably request to more effectively transfer and assign to and

A-2

vest in Purchaser, its successors and assigns, each of the Purchased Assets, all at the sole cost and expense of Purchaser.

2.      This Bill of Sale shall be subject to the terms and conditions set forth in the Purchase Agreement and the Sale Order.  The Seller and the Purchaser hereby acknowledge and agree that the provisions of this Bill of Sale shall not modify or limit the full force and effect of the terms and provisions (including the representations, warranties and covenants and limitations thereof) of the Purchase Agreement or the Sale Order.  Nothing contained in this Bill of Sale shall be construed as a waiver of or limitation upon any of the rights or remedies of the Parties based upon, arising out of, or otherwise in respect of the Purchase Agreement.  In the event of a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement, as approved by the Sale Order, shall prevail, govern and control in all respects without limitation.

3.      Section 10.12 of the Purchase Agreement is hereby incorporated by reference into this Bill of Sale and shall apply as if fully set forth herein *mutatis mutandis*.

4.      The Parties may execute this Bill of Sale in multiple counterparts, each of which constitutes an original as against the Party that signed it, and all of which together constitute one agreement.  This Bill of Sale is effective upon delivery of one executed counterpart from one Party to the other Party.  The signatures of all Parties need not appear on the same counterpart.  The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

5.      The undertakings, covenants and agreements set forth herein shall be binding upon, inure to the benefit of, and be enforceable by, the Seller and the Purchaser and their respective successors and assigns.

[*Signature Pages Follow*]

A-3

**IN WITNESS WHEREOF**, the Parties have executed this Bill of Sale as of the date first above written.

**SELLER:**

**FLIPCAUSE, INC.** a Delaware corporation

By:_____
Name:
Title:

**PURCHASER:**

**[\_\_\_]**, a **[State] [Entity]**

By: _____
Name:
Title

71193/0001-52581497v2

## EXHIBIT B

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

71193/0001-52581497v2

**EXHIBIT B**

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT** (the "Agreement"), dated as of **[____]**, 2026 (the "Effective Date"), between Flipcause, Inc., a Delaware corporation, as assignor (the "Assignor") and **[___]**, a **[State] [Entity]** in its capacity as assignee of the Assumed Liabilities (the "Assignee").  The Assignor and the Assignee are each a "Party" hereto and are collectively referred to herein as the "Parties".  Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Assignor and the Assignee are parties to the Asset Purchase Agreement, dated as of **[_____]**, 2026 (the "Purchase Agreement"), pursuant to which the Assignor has agreed to sell, assign, transfer, convey and deliver to the Assignee, and the Assignee has agreed to purchase from the Assignor, all of the Assignor's right, title and interest in and to the Purchased Assets (including the Intangible Rights (as defined below)), free and clear of all Liens and Claims (other than the Assumed Liabilities), and the Assignee has agreed to assume, discharge and perform when due the Assumed Liabilities from and after the Closing Date; and

WHEREAS, this Agreement is being provided to evidence the Assignor's assignment to the Assignee of the Intangible Rights (as defined below), free and clear of any and all Liens and Claims (other than the Assumed Liabilities), and the Assignee's assumption of the Assumed Liabilities, from and after the Closing Date pursuant to the terms and conditions of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree, effective as of the Effective Date, as follows.

1. Assignment and Assumption.  Pursuant to the Purchase Agreement and in accordance with the terms thereof, the Assignor hereby sell, assign, transfer and sets over unto the Assignee all of its right, title, benefit, privileges, and interest in and to the Intangible Rights, free and clear any and all Liens and Claims (other than the Assumed Liabilities).  "Intangible Rights" means all of the Purchased Assets constituting intangible personal property, including the Assumed Contracts.  The Assignee hereby accepts such assignment and agrees to assume, discharge, and perform as and when due, all obligations arising under the Intangible Rights and the Assumed Liabilities.  Notwithstanding anything herein to the contrary, this Agreement shall not be deemed to be an assignment by the Assignor to the Assignee of or an assumption by the Assignee of any of the Excluded Liabilities or Excluded Assets.

2. Purchase Agreement.  This Agreement shall be subject to the terms and conditions set forth in the Purchase Agreement and the Sale Order.  The Assignor and the Assignee hereby acknowledge and agree that the provisions of this Agreement shall not modify or limit the full force and effect of the terms and provisions (including the representations, warranties and covenants and

B-2

71193/0001-52581497v2

limitations thereof) of the Purchase Agreement or the Sale Order.  Nothing contained in this Agreement shall be construed as a waiver of or limitation upon any of the rights or remedies of the Parties based upon, arising out of, or otherwise in respect of the Purchase Agreement.  In the event of a conflict between the terms and provisions of this Agreement and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement, as approved by the Sale Order, shall prevail, govern and control in all respects.

3.  Headings.  The section headings used herein are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

4.  Governing Law; Jurisdiction; Waiver of Jury Trial.  Section 10.12 of the Purchase Agreement is hereby incorporated by reference into this Agreement and shall apply as if fully set forth herein *mutatis mutandis.*

5.  Severability; Conflicts.  In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.

6.  Successors and Assigns.  This Agreement shall bind the Parties, their legal representatives, and their permitted successors and assigns.

7.  Entire Agreement.  This Agreement, the Purchase Agreement and the Sale Order constitute the entire agreement between the Parties.  No amendment or modification of this Agreement shall be binding or valid unless set forth in writing and executed by the Parties.

8.  Counterparts.  The Parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the Party that signed it, and all of which together constitute one agreement.  This Agreement is effective upon delivery of one executed counterpart from one Party to the other Party.  The signatures of all Parties need not appear on the same counterpart.  The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

**[*Signature Page Follows*]**

B-3

**IN WITNESS WHEREOF**, the Parties have caused this agreement to be executed on the date first above written.

<strong><u>ASSIGNOR:</u></strong>

**FLIPCAUSE, INC.**

By:_____
Name:
Title:

<strong><u>ASSIGNEE:</u></strong>

**[___]**, a **[State] [Entity]**

By: _____
Name:
Title:

C-1

## EXHIBIT C

## FORM OF INTELLECTUAL PROPERTY ASSIGNMENT

C-1

71193/0001-52581497v2

## EXHIBIT C

FORM OF INTELLECTUAL PROPERTY ASSIGNMENT

**THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (this "Assignment"), effective as of **[____]**, is by and between Flipcause, Inc., a Delaware corporation (the "Assignor"), and **[___]**, a **[State] [Entity]** ("Assignee"). Assignor and Assignee are each a "Party" hereto and are collectively referred to herein as the "Parties". Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

**W I T N E S S E T H**:

WHEREAS, pursuant to the terms and subject to the conditions of the Asset Purchase Agreement, dated **[_____]** (the "Purchase Agreement"), between the Assignee and the Assignor, the Assignor has agreed to sell to the Assignee, and the Assignee has agreed to purchase from the Assignor, the Purchased Assets; and

WHEREAS, pursuant to the Purchase Agreement, the Assignor desires to sell, assign, convey, deliver and transfer the entire right, title and interest in, to and under all Company Owned Intellectual Property, including (i) all Seller Names and Marks and (ii) Patents, Copyrights and Trademarks and other Intellectual Property, and all Company Used Intellectual Property and IP Agreements set forth on Schedule A hereto (collectively, the "Acquired Intellectual Property"); to the Assignee and the Assignee desires to acquire the entire right, title and interest in, to and under such Acquired Intellectual Property.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Purchase Agreement and subject to the terms and conditions therein, the Parties, intending to be legally bound, hereby agree as follows:

1. The Assignor hereby irrevocably sells, transfers, assigns, conveys, delivers and transfers to the Assignee, and the Assignee hereby accepts the sale, transfer, assignment, conveyance and delivery of, the entire right, title and interest in, to and under the Acquired Intellectual Property, together with (i) all goodwill associated therewith, in each case to be held and enjoyed by the Assignee for its own use and enjoyment as fully and entirely as the same would have been held and enjoyed by the Assignor if this assignment and sale had not been made, including the right to claim priority under the International Convention for the Protection of Industrial Property and under any other international arrangement to which the United States of America is or hereafter becomes a signatory (but not, for the avoidance of doubt, any Excluded Liability), (ii) all rights of any kind whatsoever of Assignor accruing under and/or derived from any of the Acquired Intellectual Property provided by applicable Law of any jurisdiction, (iii) any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for

C-2

such legal and equitable relief and to collect, or otherwise recover, any such damages, and (iii) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing.

2.        Concurrent with the execution of this Assignment, the Assignor shall transfer any and all domain names and social media accounts included in the Acquired Intellectual Property from the Assignor's accounts to the Assignee's account (such that the Assignee will be listed as the registrant and/or owner of such domain names and social media accounts in the applicable registrar) and shall deliver to the Assignee all necessary Auth-Info codes and all other required passwords necessary to unlock and control such domain names and social media accounts.

3.        Subject to the other express provisions of this Assignment and the Purchase Agreement, upon the request of either the Assignee, on the one hand, or the Assignor, on the other hand, the other party will execute and deliver such other documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Assignment and the Purchase Agreement and the transactions contemplated by this Assignment and the Purchase Agreement.

4.        Assignor hereby authorizes and requests the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record and register Assignee as assignee and owner of the entire right, title and interest in, to and under the Acquired Intellectual Property.

5.        This Assignment shall be subject to the terms and conditions set forth in the Purchase Agreement and the Sale Order.  The Assignor and the Assignee hereby acknowledge and agree that the provisions of this Assignment shall not modify or limit the full force and effect of the terms and provisions (including the representations, warranties and covenants and limitations thereof) of the Purchase Agreement or the Sale Order.  Nothing contained in this Assignment shall be construed as a waiver of or limitation upon any of the rights or remedies of the Parties based upon, arising out of, or otherwise in respect of the Purchase Agreement.  In the event of a conflict between the terms and provisions of this Assignment and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement, as approved by the Sale Order, shall prevail, govern and control in all respects.

6.        Section 10.12 of the Purchase Agreement is hereby incorporated by reference into this Agreement and shall apply as if fully set forth herein *mutatis mutandis.*

7.        This Assignment is binding upon, and inures to the benefit of, the parties hereto and their respective legal representatives, successors and assigns.  No waiver, modification or change of any provision of this Assignment shall be valid unless in writing and signed by the Party against whom such claimed waiver, modification or change is sought to be enforced.

8.        The Parties may execute this Assignment in multiple counterparts, each of which constitutes an original as against the Party that signed it, and all of which together constitute one agreement.  This Assignment is effective upon delivery of one executed counterpart from one Party to the other Party.  The signatures of all Parties need not appear on the same counterpart.

C-3

71193/0001-52581497v2

C-4

The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

[*Signature Pages Follow*]

71193/0001-52581497v2

**IN WITNESS WHEREOF**, the Parties have caused this Assignment to be executed on the date first above written.

**AS ASSIGNOR:**

**FLIPCAUSE, INC.,** a Delaware corporation

By:_____
Name:
Title:

STATE OF                          )
                                  ) ss
COUNTY OF                         )

On the ____ day of _____, ____, before me personally came _____, who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as _____ of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

_____
Notary Public

(PLACE STAMP AND SEAL ABOVE)

[*Signature Page to Intellectual Property Assignment*]
C-4

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNEE:**

**[___]**, a **[State] [Entity]**

By: _____
Name:
Title

STATE OF                )
                        ) ss
COUNTY OF               )

On the ____ day of _____, ____, before me personally came _____, who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as _____ of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

_____
Notary Public

(PLACE STAMP AND SEAL ABOVE)

[*Signature Page to Intellectual Property Assignment*]

C-5

Schedule 2.10(a)(x)

Tools Requiring Username, Password & Access

| | |
|---|---|
| Adobe Acropro | k6 |
| Adobe Creative Cloud | Lambdatest |
| Aircall | Laracasts |
| Airtable | Load Impact |
| Anytime Mailbox | Lockwell |
| Atlassian | Mailchimp |
| AWS | Microsoft |
| Beamer pro | Namecheap |
| Beautiful.AI | Panda Doc |
| Canva | Perimeter 81 |
| Cloud4j | Postman |
| Cloudcraft | QuickBooks |
| Cloudflare | Realvalidation |
| Cobisi Research | Rippling Gsuite |
| Constant Contact | Salesforce |
| Cronitor | Sendgrid |
| Cyberghost | Sentry |
| Doppler Technologies | Skype |
| Dropsecure | Slack |
| Evernote | Stamps.com |
| Fastzip | Stripe |
| FIGMA | Synthesia |
| Flywheel | TeamViewer |
| Github | Twilio |
| Google Cloud | Weebly |
| Grafana Labs | Zapier |
| Integromat | Zipcode API |
| Intercom | Zoom |
| ip-api Pro | |
| Jack London | |

Schedule 3.5

Contract & Cure Schedule

| Contract Counterparty | Cure Amount |
|---|---|
| Weebly | $17,845.50 |
| Numeracle | $3,437.50 |

# Flipcause - Bid Draft APA(52351949.5) _PSWH Comments 2-24-26_(4792925.11)

Final Audit Report                                                      2026-02-25

| | |
|---|---|
| Created: | 2026-02-25 |
| By: | Samantha Alexander (SAlexander@pashmanstein.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAFL3OaqHv2P3ETFVyq9NaxXhVU43kFp1j |

## "Flipcause - Bid Draft APA(52351949.5) _PSWH Comments 2-24-26_(4792925.11)" History

Document created by Samantha Alexander (SAlexander@pashmanstein.com)
2026-02-25 - 2:34:51 AM GMT

Document emailed to Scott Rassatt (scott@evermore-ventures.com) for signature
2026-02-25 - 2:34:59 AM GMT

Document emailed to Danny Vivier (danny@evermore-ventures.com) for signature
2026-02-25 - 2:35:00 AM GMT

Email viewed by Danny Vivier (danny@evermore-ventures.com)
2026-02-25 - 2:35:30 AM GMT

Document e-signed by Danny Vivier (danny@evermore-ventures.com)
Signature Date: 2026-02-25 - 2:35:49 AM GMT - Time Source: server

Email viewed by Scott Rassatt (scott@evermore-ventures.com)
2026-02-25 - 3:26:14 AM GMT

Document e-signed by Scott Rassatt (scott@evermore-ventures.com)
Signature Date: 2026-02-25 - 3:27:22 AM GMT - Time Source: server

Agreement completed.
2026-02-25 - 3:27:22 AM GMT

**Adobe Acrobat Sign**